MARJORIE SCATUORCHIO AND MICHAEL A. SCATUOR-
CHIO, INC., A CORPORATION OF NEW JERSEY,
PLAINTIFFS-RESPONDENTS, v. JERSEY CITY INCIN-
ERATOR AUTHORITY, A PUBLIC CORPORATION, CITY
OF JERSEY CITY, A MUNICIPAL CORPORATION, AND
HUDSON CITY CONTRACTING CO., A CORPORATION
OF NEW JERSEY, DEFENDANTS-APPELLANTS.

Argued October 13, 1953—Decided November 23, 1953.

74

Mr. *Maurice A. Cohen* argued the cause for the appellant Hudson City Contracting Co.

Mr. *Nicholas S. Schloeder* argued the cause for the appellants Jersey City Incinerator Authority and City of Jersey City (*Mr. John B. Graf*, attorney for appellant City of Jersey City).

Mr. *Joseph Weintraub* argued the cause for the respondents. (*Messrs. McGlynn, Weintraub & Stein*, attorneys).

The opinion of the court was delivered by

BURLING, J.  This is an appeal in a proceeding in lieu of the former prerogative writ of *certiorari*, instituted by the plaintiffs Marjorie A. Scatuorchio and Michael A. Scatuorchio, Inc., a New Jersey corporation (hereinafter called the plaintiffs) against Jersey City Incinerator Authority (hereinafter called the Authority), City of Jersey City (hereinafter called the city), and Hudson City Contracting Co., a New Jersey corporation (hereinafter called Hudson), defendants.  The complaint, in general, constituted an attack on garbage and refuse disposal contracts entered into between Hudson and the Authority.  The Superior Court, Law Division, granted the plaintiffs' motion for summary judgment.  From the judgment entered as a consequence thereof, the defendants appealed to the Superior Court, Appellate Division.  Prior to hearing there certification was allowed on our own motion.

The course of decision in this case, and the determination on this appeal, is guided by the specific mandate of *Rule* 3:56-3 (now *R. R.* 4:58-3), applicable to civil actions in lieu of the former proceedings under the prerogative writs by virtue of *Rules* 3:81-2 and 3:81-3 (now *R. R.* 4:88-2, 3).  The pertinent portion of *Rule* 3:56-3, *supra*, provided that a summary judgment "shall be rendered forthwith if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show palpably that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment  *  *  *  as a matter of law.  *  *  *"

The complaint alleged that for approximately 30 years the corporate plaintiff had held contracts with the city for the collection and removal of ashes, garbage, kitchen refuse and waste paper from all the streets of the City of Jersey City, and the last contract expired by its terms on December 31, 1952.  This was admitted by the Authority and by the city, but Hudson answered to the effect that it had no knowledge upon which to admit or deny these allegations.  The depositions and affidavits filed, however, disclose no genuine

issue of fact to be decided in this connection. At a date far in advance of the termination date of the corporate plaintiff's contract, the Authority was created. The affidavit of Mr. Sudnik, secretary of the Authority, which is not controverted in this respect, declared that the Authority was created under the terms of *L.* 1948, *c.* 348 (*N. J. S. A.* 40:66*A*–1 *et seq.*), in December 1951 and the date of its organization was January, 1952. There is no genuine issue in this case as to the fact or time of creation and organization of the Authority, although the complaint had averred that the date of its creation was December 1950. This appears to have been a typographical error.

In October 1952 the city advertised for bids for the scavenger contract for a period beginning January 1, 1953, on specific "proposals and specifications," and the corporate plaintiff submitted its bid "in all respects complying" therewith, at the time (October 21, 1952) and place specified. No other bid was submitted, but the bid was rejected on the ground that the city, having theretofore created the Authority, was without power to contract in this field of endeavor. This, alleged in the complaint, was admitted by both the city and the Authority. Hudson again averred "no knowledge," but the depositions and affidavits disclose no issue of fact on this item.

In November 1952, it was admitted by the city and the Authority as charged in the complaint, the Authority advertised for bids for the scavenger contract for the period beginning January 1, 1953; the corporate plaintiff submitted its bid at the specified time (November 24, 1952) and place in full compliance with the proposals and specifications; no other bid was submitted; and the bid was rejected on December 2, 1952 by resolution of the Authority for the expressed reason that this was "in the best interests of the City of Jersey City." The corporate plaintiff's bid for the one-year contract was $766,000. Although Hudson expressed its lack of knowledge in the answer, the affidavits and depositions clearly show no genuine issue as to these facts.

In December 1952 the Authority again advertised for bids for the 1953 scavenger contract. Pursuant to the proposal the corporate plaintiff submitted its bid (in compliance with the proposals and specifications) at the time (December 15, 1952) and place fixed for the submission thereof. Another bid was submitted on behalf of Municipal Contracting Co. The bids were rejected on December 15, 1952, Municipal's for the reason that it failed to comply with the proposals and specifications, the corporate plaintiff's for the expressed reason that rejection was in the best interests of the City of Jersey City. So much was admitted by the Authority and the city. Hudson again asserted no knowledge. The affidavit of Mr. Sudnik admits that Municipal's bid did not comply with the advertised prerequisites and specifications and for that reason was rejected on advice of counsel. It appears that the corporate plaintiff's bid was $766,000 and that Municipal's was $680,000, for the one-year contract.

Thereafter (on December 16, 1952) it is admitted by all parties, the city adopted a resolution purporting to declare that an emergency existed with respect to the collection and removal of garbage and refuse materials and purporting to appoint the Authority as its agent during such emergency. It is further admitted that by notice published December 19, 20 and 22, 1952, the Authority advertised said resolution of the city and invited proposals to be made by qualified contractors to the technical director of the Authority, for scavenger work for a period beginning January 1, 1953, not to exceed 60 days.

It is admitted by the Authority and the city that the corporate plaintiff on December 30, 1952 made inquiry of the technical director of the Authority as to whether a scavenger contract had been made and was informed no contract had been entered into. Although Hudson averred it had no knowledge, the depositions and affidavits leave no doubt of the truth of this fact.

It is alleged and admitted that a contract was made between the Authority and Hudson. The pleadings are somewhat at variance in this respect but in the record made

on the filing of depositions and affidavits the full contract appears. This contract was entered into on December 31, 1952, for a *one-year term* (January 1, 1953 to December 31, 1953), and contained a provision for termination by the Authority on ten days' written notice prior to the termination of any calendar month during the existence of the contract. The contract contained no reference to any "emergency," merely reciting the fact that the Authority had twice advertised for bids and had rejected same, and that Hudson had offered to accept the scavenger contract. The aggregate fee for the year 1953 was set at $720,000, of which $100,800 was to be paid in January 1953, $86,400 in February 1953, $72,000 in March 1953, and the balance in equal monthly payments of $51,200 each.

The plaintiffs on January 6, 1953 filed the original complaint in this action seeking judgment:

"A. Determining and adjudging that the contract between the City or the Authority and Hudson is illegal and void.

B. Restraining and enjoining the City and the Authority from appropriating any moneys for the payment to Hudson and from making any payment to Hudson.

C. Restraining and enjoining the City and the Authority from assigning or directing any employees of the City or the Authority to perform the contract on behalf of Hudson.

D. Ordering, directing and enjoining the City and the Authority to comply with the statutes and to let out a contract on the basis of competitive bidding to the lowest responsible bidder, and upon the security for performance required by the statute.

E. Granting to plaintiffs such other relief as may be just and equitable." .

The Superior Court, Law Division, on January 6, 1953 granted an order to show cause directing the defendants to show cause (on January 16, 1953) "why an Order should not be made enjoining and restraining the City of Jersey City from appropriating any funds for the payments of any moneys to defendant Hudson City Contracting Co. in connection with the contract described in the Complaint, and enjoining the City of Jersey City and the Jersey City Incinerator Authority from making any payment to Hudson City Contracting Co. in connection with said contract until

the final determination of this cause," and granted the plaintiffs leave to take depositions. By order filed January 16, 1953 the hearing on the order to show cause was continued until January 23, 1953, but the defendants city and Authority were restrained from paying to defendant Hudson any sum of money beyond 7/31sts of the sum of $100,800 (the January payment set forth in the December 31, 1952, contract, *ante*) until further hearing, provided Hudson should undertake to collect and remove garbage and refuse in Jersey City until January 23, 1953. On January 23, 1953 the hearing on the order to show cause was held. The Superior Court, Law Division, after hearing and argument, on that date entered an order restraining defendants city and Authority from making any payment to defendant Hudson and under the purported contract between the Authority and Hudson dated December 31, 1952, until final determination of the cause. All three defendants were represented by counsel at the proceedings on January 16 and 23, 1953.

The Authority had advertised again for bids to be submitted January 19, 1953 for a scavenger contract, for the period beginning March 1, 1953 and ending December 31, 1953, terminable upon 30 days' notice. Bids were submitted by the corporate plaintiff and by defendant Hudson. The bids were on a monthly basis, the corporate plaintiff's being $1,000 or more less than Hudson's for each month. The total of the corporate plaintiff's bid was $522,800, whereas that of Hudson was $540,000. The bid of the corporate plaintiff was accompanied by a $50,000 surety bond as specified in the proposal; Hudson's bid was accompanied by a certified check for $25,000. (These facts are set forth in an amended complaint hereinafter adverted to. They were expressly admitted by the Authority, and were not denied by Hudson.)

At a meeting of the Authority held on February 3, 1953, attended by four of the five members thereof, the bids submitted by the corporate plaintiff and by Hudson on January 19, 1953, *ante*, were rejected on the ground they were too high and a resolution was adopted purporting to declare

an emergency. At the same time and by the same resolution the Authority awarded a contract to Hudson, on a *per diem* basis, for the scavenger work for the balance of the month of February, at a rate not to exceed $3,416.66 per day. The Authority also directed advertisement for new bids to be submitted February 16, 1953. The Authority admits these facts, and its resolution of February 3, 1953 stated that performance by Hudson was to be in accord with the specifications annexed to its purported contract of December 31, 1952. Hudson avowed lack of knowledge of some of these facts, although admitting the award to it of the February 3, 1953 *per diem* contract at $3,416 per day. The pleadings, depositions and affidavits on file, with the exhibits incorporated therein, palpably demonstrate that no genuine issue exists in relation to these matters.

On or about February 4, 1953 the plaintiffs filed an amendment to their complaint, reciting, *inter alia*, the foregoing additional matters and demanding further judgment:

"1. Adjudging and declaring to be illegal and void the contract for a *per diem* payment to Hudson, and permanently restraining and enjoining any payments to Hudson with respect thereto.

2. Ordering and directing the defendant Authority to accept the bid of plaintiff corporation submitted on January 19, 1953, and to enter into a contract in accordance with the terms thereof.

3. Restraining and enjoining the defendant Authority from acting upon any further proposals for bids for the year 1953, except proposals with respect to a period prior to March 1, 1953.

4. Restraining and enjoining, until the final determination of this cause, any payments to Hudson under the *per diem* agreement described in the amendment to the complaint."

On February 5, 1953 the Superior Court, Law Division, in this cause, entered an order to show cause (directed to all three defendants) "why defendants, Jersey City Incinerator Authority and City of Jersey City, should not be restrained and enjoined until the final hearing of this cause from making any payments to the Hudson City Contracting Co., and why an Order should not be made peremptorily ordering and directing the defendant Jersey City Incinerator Authority to accept the bid of the plaintiff corporation submitted

on January 19, 1953, and why the said defendants should not be restrained and enjoined from receiving any further bids with respect to the collection of garbage for the year 1953." This order also contained a preliminary restraint against any payments to Hudson by the City or the Authority.

It appears (and is not denied by any party) that on February 6, 1953 the Authority "borrowed" city employees and equipment and undertook the performance of the necessary scavenger work in the City of Jersey City directly. This is substantiated by stipulation (not controverted by Hudson) entered into between the plaintiffs and the defendants city and Authority on February 24, 1953, that:

"1. The emergency claimed by the defendants to have existed no longer exists by reason of the following facts:

(a) The Jersey City Incinerator Authority has awarded a contract for a ten month period beginning March 1, 1953 on the basis of competitive bidding.

(b) The Jersey City Incinerator Authority is presently collecting the refuse and garbage by the use of vehicles which it has hired and men which it employs.

2. The parties accordingly request that the trial date presently set for February 26, 1953 be continued to a date after March 6, 1953 to permit any of the parties hereto to make a motion for summary judgment on March 6, 1953."

On February 24, 1953 the plaintiffs noticed motion for summary judgment.

On March 19, 1953 defendant Hudson was granted leave to file answer to the complaint and to the amended complaint, upon condition that its treasurer, Abe Klein, appear for examination on pretrial discovery. Hudson's answers (portions of which were hereinbefore adverted to) were filed March 19, 1953.

The Superior Court, Law Division, on April 6, 1953 entered final judgment, in terms as follows:

"ORDERED that plaintiffs' motion for summary judgment against the defendants be and the same is hereby granted and final judgment is hereby entered in favor of the plaintiffs and against the defendants; and it is further

ORDERED ADJUDGED AND DETERMINED, that the contract purportedly made on December 31, 1952 between defendant Hudson City Contracting Co. and the defendant, Jersey City Incinerator Authority, is illegal, null and void *ab initio;* and it is further

ORDERED, ADJUDGED AND DETERMINED that the contract purportedly made between the defendant Hudson City Contracting Co. and the defendant Jersey City Incinerator Authority pursuant to the resolution of the defendant Jersey City Incinerator Authority adopted on February 3, 1953, is illegal, null and void *ab initio.*"

In the briefs of the defendants Hudson and the Authority it is stated that there is pending a separate action instituted in the Superior Court, Law Division, on or about May 1, 1953 by Hudson against the Authority hereinafter adverted to. That action appears to involve claims of Hudson (a) asserted under the December 31, 1952 and February 3, 1953 contracts herein considered, and (b) other counts for services rendered during the same period, upon the *quantum meruit* theory.

The defendants city and Authority and the defendant Hudson filed appeals from the final judgment of April 6, 1953 in this cause to the Superior Court, Appellate Division. As hereinbefore noted, (after consolidation) these appeals were certified on our own motion before hearing there.

The questions involved on these appeals include: (1) Does *R. S.* 40:66–4 as amended by *L.* 1942, *c.* 133, *sec.* 1, relating to municipalities' contracts for the collection of garbage, permit the making of contracts in emergent circumstances under *R. S.* 40:50–1? (2) Is the declaration of an emergency by a municipal governing body under *R. S.* 40:50–1, *supra,* subject to judicial review? (3) Was there an "emergency" here, and were the contracts in question (*i. e.,* the December 31, 1952 written contract and the February 3, 1953 *per diem* contract, both entered into between the Authority and Hudson) *ultra vires?* (4) Is the Authority obligated to pay Hudson under either contract? (5) Was Hudson prejudicially denied leave to resort to pretrial discovery?

## I. Applicability of *R. S.* 40:50–1

The initial question involved is whether the emergency provision of *R. S.* 40:50–1, *supra*, may be invoked by the proper governmental body in connection with scavenger contracts. There is no doubt in our minds that it may be so invoked.

*R. S.* 40:66–4 as amended by *L.* 1942, *c.* 133, *sec.* 1, *supra*, provides:

"The governing body may, if it deem it more advantageous, contract with any person for the cleaning of the streets, or the collection, removal and disposal of ashes, garbage, refuse and waste matter or any portion thereof. Before making any such contract or contracts the governing body shall first adopt specifications for the doing of the work in a sanitary and inoffensive manner, and any such contract or contracts the amount of which exceeds one thousand dollars ($1,000.00) shall be entered into and made only after bids shall have been advertised therefor, and awarded in the manner provided in chapter fifty of this Title (§ 40:50–1 et seq.). The bidder or bidders to whom the contract or contracts shall be awarded shall give satisfactory bond or other security for the faithful performance of the work. The contract shall include and in all respects conform to the specifications adopted for the doing of the work."

*R. S.* 40:50–1, *supra*, provides:

"No municipality shall enter into any contract for the doing of any work, or for the furnishing of any materials, supplies or labor, or the hiring of teams or vehicles, where the sum to be expended exceeds the sum of one thousand dollars, unless the governing body shall first publicly advertise for bids therefor, and shall award the contract to the lowest responsible bidder.

"This section shall not prevent any municipality from having any work done by its own employees, nor shall it apply to repairs, or to the furnishing of materials, supplies or labor, or the hiring of teams or vehicles, when the safety or protection of public property or the public convenience require, or the exigency of the public service will not admit of such advertisement. In such case, however, the board shall, by resolution, passed by the affirmative vote of four-fifths of all the members of the board or body having charge thereof, declare the exigency or emergency to exist, and set forth in the resolution the nature thereof and the approximate amount to be so expended."

*N. J. Const.* 1947, *Art.* IV, *Sec.* VII, *par.* 11 requires a liberal construction of these statutes in favor of municipal corporations formed for local government. This, together with the clear text of *R. S.* 40:66–4, as amended, *supra,* and the settled principle of statutory construction, that statutes *in pari materia* are to be construed together so as to effectuate the general legislative policy, *Miller v. Bd. of Chosen Freeholders, Hudson County,* 10 *N. J.* 398, 413 (1952), requires the conclusion that resort to the emergency proviso of *R. S.* 40:50–1, *supra,* may be available to a municipal governing body such as the Authority, in a proper case under *R. S.* 40:66–4, as amended, *supra.*

II. DECLARATION OF EMERGENCY—JUDICIAL REVIEW

A question involved, advanced by the city and the Authority, is whether a municipal declaration of an emergency is subject to judicial review.

It is axiomatic that municipal bodies in this State have no powers other than those delegated by the Legislature, and must perform their prescribed activities within the statutory ambit. Equally well settled is the jurisdiction of the former Supreme Court to inquire into the validity of municipal activities through the medium of the prerogative writ of *certiorari* (now constitutionally vested in the Superior Court, subject to rules promulgated by this court). Half a century ago the former Court of Errors and Appeals reiterated the even then long-established law of this State that this jurisdiction could not be impaired by adverse legislation. *Green v. Heritage,* 64 *N. J. L.* 567, 572 (*E. & A.* 1900).

These principles resulted in a very positive declaration by the former Supreme Court in *Lyons v. Bayonne,* 101 *N. J. L.* 455, 457 (*Sup. Ct.* 1925), that the court had jurisdiction to determine the validity of a municipal declaration of emergency (*i. e.,* to adjudge whether an emergency in fact existed at the time of the municipal declaration thereof), even where the Legislature (as it had in the *Lyons* case, *supra*) by the statute in question (there, *L.* 1919; *c.* 178) had declared that where the municipal resolution was adopted

by a three-fourths vote it was conclusive as to the character and existence of an emergency within the act. The *Lyons* case, *supra*, was expressly followed in this respect as to another statute, *R. S.* 40:2–31 (1), in *Murphy v. West New York*, 130 *N. J. L.* 341, 342 (*Sup. Ct.* 1943). In the *Murphy* case, *supra*, the former Supreme Court held (*p.* 342) :

"Whether or not an emergency in fact exists, within the contemplation of this statute, is a question for the court, and the determination of the municipality on that fact is not conclusive."

This decision was fortified as an authority by the approval thereof implicit in *Murphy v. West New York*, 130 *N. J. L.* 569 (*Sup. Ct.* 1943), a decision rendered by three justices of the former Supreme Court other than those who heard and decided the earlier phase of the matter. *Cf. Murphy v. West New York*, 132 *N. J. L.* 595 (*Sup. Ct.* 1945).

While no express declaration on this question involved appears to have been enunciated by a court of last resort in this State, the determination of "emergency" by a public body has been judicially reviewed in the courts of last resort. *E. g., Frank v. Bd. of Education of Jersey City*, 90 *N. J. L.* 273, 274–278 (*E. & A.* 1917).

Upon the consideration of these and other decisions and the philosophy hereinabove expressed, we are of the opinion that the Superior Court, Law Division, had jurisdiction to determine the validity of the municipal declarations of emergency involved in this case.

That such a conclusion is not an uncommon one appears from the comparable decision of the Arizona Supreme Court in *Hunt v. Norton*, 68 *Ariz.* 1, 198 *P. 2d* 124, 5 *A. L. R. 2d* 668 (*Sup. Ct.* 1948) ; Annotations, 5 *A. L. R. 2d* 675 *et seq.* However, there appears to be some difference of opinion in judicial decisions of jurisdictions elsewhere. See for example the discussion of conflicting views on the subject contained in *Prescott v. Secretary of Commonwealth*, 299 *Mass.* 191, 12 *N. E. 2d* 462, 467–468 (*Mass. Sup. Jud. Ct.* 1938).

### III. Existence of Emergency

The declaration of an emergency contemplated by *R. S.* 40:50–1, *supra, ex necessitate* must be a declaration by the body having the authority to enter into a contract thereunder. The question involved on this aspect of the case is whether there was a valid declaration of emergency by the Authority.

It is clear that the city's "emergency" resolution of December 16, 1952 was abortive since the contract of December 31, 1952 was entered into by the Authority as an independent body. The statute requires "the body having charge thereof" to declare the emergency. The defendants, however, insist that the Authority's resolution of December 15, 1952 calling upon the city to declare an emergency constituted compliance with the statutory requirement. No question is raised as to whether the resolution involved was adopted by a four-fifths vote of the membership of the Authority.

However, assuming that the Authority's resolution of December 15, 1952 was technically adequate to constitute a declaration of the *existence* of an emergency, it was defective for failure to state the *nature* of the emergency and for failure to declare the approximate amount to be expended in meeting the emergency. *Cf. Murphy v. West New York, supra* (130 *N. J. L.*, at *p.* 342).

Although the word "emergency" as used in a statute need not always be construed to have the precise meaning accorded it by lexicographers, nevertheless words and phrases in statutes are to be given their generally accepted meaning unless inconsistent with the manifest intent of the Legislature or unless a different meaning is expressly indicated. *R. S.* 1:1–1; *Grogan v. De Sapio,* 11 *N. J.* 308, 323 (1952).

There is in *R. S.* 40:50–1, *supra,* no legislative description of types of emergent situations such as was contained in the statute, *L.* 1919, *c.* 178, subjected to review in *Lyons v. Bayonne, supra.* We are not disposed to determine, therefore, whether the full weight of the decision in the *Lyons*

case, *supra*, is applicable here. Mr. Justice Minturn in the *Lyons* case, *supra*, declared (101 *N. J. L.*, at *p.* 457):

"\* \* \* The emergency contemplated by the Legislature is not one created by the conception of the need of the local body, and due in ·great measure to the perversity and antagonism of local conditions, or the want of foresight of the (local) body at the proper time in failing to respond to conditions as they were represented. \* \* \*"

The situation in the present matter is analogous. In general parlance · an "emergency" means a "sudden or unexpected occurrence or condition calling for immediate action." *Carlson v. Hannah*, 6 *N. J.* 202, 214 (1951); *Frank v. Bd. of Education of Jersey City, supra* (90 *N. J. L.*, at *p.* 278). We need not determine on this appeal whether under this definition, even if it is deemed the sole measure of the emergency provision of *R. S.* 40:50–1, *supra*, a real emergency might arise by virtue of municipal officers' laxity, a contractor's failure or breach of contract, or other comparable reasons. It requires no citation of precedent nor exercise of the imagination to demonstrate the danger to the public health which might result from accumulations of garbage and other refuse in the streets of a municipality. However, see *Sandfort v. Atlantic City*, 134 *N. J. L.* 311, 314 (*Sup. Ct.* 1946).

The situation disclosed in the pleadings, depositions and affidavits in the present case, in despite of the fortuitous circumstance that the taxpayers of the City of Jersey City may have benefited as a result, is one that under no sense of the word, even assuming good faith on the part of defendants, could be described as an "emergency." On its face it appears at best to have been an attempt to avoid the pertinent legislative enactments and public responsibility. Compare *Driscoll v. Burlington-Bristol Bridge Co.*, 8 *N. J.* 433, 477 (1952), *certiorari* denied *Burlington County Bridge Commission v. Driscoll*, 344 *U. S.* 838, 73 *S. Ct.* 25, 97 *L. Ed.* 652 (1952), rehearing denied 344 *U. S.* 888, 73 *S. Ct.* 181, 97 *L. Ed.* 687, 123 (1952).

The first step in the maze recorded herein was the effort of the city to retain its control over the scavenger contract—the October 1952 advertisement of the city for bids. In December 1951 the city had created the Authority under the Incinerator Authorities Law, *L.* 1948, *c.* 348 (*N. J. S. A.* 40:66A–1 *et seq.*). The Authority organized in January 1952. Although a municipal agency, *L.* 1948, *c.* 348, *sec.* 4, as amended by *L.* 1950, *c.* 265, *sec.* 1 (*N. J. S. A.* 40:66A–4), the Authority was clothed by the Legislature with the status of "a public body politic and corporate *constituting a political subdivision of the State* established as an instrumentality *exercising public and essential governmental functions.*" (Emphasis supplied) *L.* 1948, *c.* 348, *sec.* 7 (*N. J. S. A.* 40:66A–7). Compare *De Lorenzo v. City of Hackensack,* 9 *N. J.* 379 (1952); *Hill v. Borough of Collingswood,* 9 *N. J.* 369, 372 (1952); *Glick v. Trustees of Free Public Library,* 2 *N. J.* 579, 584 (1949). In addition, this statute expressly provided that after the creation of an incinerator authority, the sponsor municipality is prohibited from granting scavengers' licenses and from entering into "* * * any contract for, the collection, treatment and disposal of garbage and refuse * * *." *L.* 1948, *c.* 348, *sec.* 27 (*N. J. S. A.* 40:66A–27). Clearly, these provisions not only placed the responsibility for garbage and refuse collection in the Authority but also withdrew the power to act in the premises from the city. Therefore the city, tardily recognizing the plain mandate of the statute it had so recently invoked, properly rejected the October bid of the corporate plaintiff—a bid it had had no power to invite.

As hereinbefore stated, the Authority next advertised for bids for the 1953 scavenger contract. This was in November 1952. The bid of the corporate plaintiff was admitted to have been made in full compliance with the proposals and specifications, at the proper place and time (November 24, 1952). Being the sole bid, it was also the lowest bid. It was admitted that this bid was rejected for the expressed reason that its rejection was "in the best interests of the City of Jersey City."

Following the rejection of the November bid, the Authority again advertised for bids for the 1953 scavenger contract in December, 1952. As hereinbefore noted, the corporate plaintiff submitted a timely bid that defendants city and Authority admit complied in all respects with the proposals and specifications. The only other bid, by Municipal Contracting Co., was disqualified, a fact also admitted by the city and the Authority and corroborated in the depositions without dispute. This December bid of the corporate plaintiff appears to have been valid and could have been accepted. Mr. Sudnik, one of the commissioners and secretary of the Authority, even testified on deposition that he didn't know whether the corporate plaintiff's bid was too high.

Upon the rejection of this bid, the Authority by resolution on December 15, 1952 sought to induce the city to declare an emergency under *R. S.* 40:50–1, *supra*. Under the Incinerator Authorities Law, *L.* 1948, *c.* 348, *supra*, the Authority's request was *ultra vires*, as was the city's purported compliance therewith by resolution on December 16, 1952. Further, the nature of the emergency and the amount estimated to be necessary to meet the emergency, elements specifically required by *R. S.* 40:50–1, *supra*, were notoriously lacking in both the resolution of the Authority (dated December 15, 1952) and the resolution of the city (dated December 16, 1952).

There was a situation neither sudden nor unforeseen, brought about by the decision of the Authority twice in succession to reject the bid of the lowest responsible bidder under *R. S.* 40:66–4, as amended, *supra*, as well as by *R. S.* 40:50–1, *supra*, and by resort to the emergency proviso to award a contract for the same term to another contractor who had not placed a bid. *Cf. Lyons v. Bayonne, supra; Murphy v. West New York, supra*. It is well settled that where a contract is awarded the low bid ordinarily should be accepted in preference to a higher bid (or in preference to a non-bidding contractor) where the low bidder is a responsible party and has met the specifications (as is here admitted). *A. C. Schultes & Sons v. Haddon Twp.*, 8 *N. J.*

103, 109, 110 (1951). *Cf. Shaw v. Trenton*, 49 *N. J. L.* 339, 342 (*Sup. Ct.* 1887), expressly approved on this point but reversed on other grounds, 49 *N. J. L.* 638 (*E. & A.* 1887); *Sellitto v. Cedar Grove Township*, 133 *N. J. L.* 41, 42–44 (*Sup. Ct.* 1945). Assuming that the Authority had the reserved right to reject all bids in the best interests of the municipality, however, no bidder could claim any contractual rights until he had been awarded the contract. *Cf. Faist v. Hoboken*, 72 *N. J. L.* 361, 364 (*Sup. Ct.* 1905); *Armitage v. Newark*, 86 *N. J. L.* 5, 9 (*Sup. Ct.* 1914). In the latter case, however. the former Supreme Court held that even where the right to reject any and all bids is properly reserved, the statute may not be *evaded* "under the color of the rejection 'of any and all bids.'" While a true emergency might arise by virtue of a total lack of bidding in compliance with reasonable proposals and specifications by responsible bidders, sanction of the course here pursued would be a subversion of the legislative intent expressed in *R. S.* 40:50–1, *supra*. *Cf. Grogan v. De Sapio*, 11 *N. J.* 308, 316–317 (1953). As an example, the deposition of Mr. Sudnik shows that the stated reason the Authority considered the situation emergent was that it desired to obtain the "best possible offer for the City." Mr. Sudnik further testified that the Authority did not have enough time to readvertise and suggested that the Authority members should not be required to work over the Christmas holidays. When asked, "Why couldn't you have had your meeting between the holidays?" Mr. Sudnik testified "Because the chairman didn't call it." Further, when asked why the so-called emergency contract had been let for a term of one year rather than for the contemplated emergency period of two months, Mr. Sudnik testified (on January 21, 1953), "I wouldn't recall the exact reason for that now." These, of course, are but examples of the voluminous testimony in the depositions filed in this cause, of which a considerable portion was included in the appendix of one or more of the parties and has been thoroughly scrutinized.

No true emergency existing under the statute and no declaration of emergency and statement of the nature thereof having been made as required by the statute, the contract of December 31, 1952 between Hudson and the Authority was *ultra vires*. This result renders it unnecessary to consider the allegations of collusion and bad faith contained in the complaint, or the significance (if any) of the fact (admitted by Hudson) that Hudson was incorporated on December 31, 1952.

Moving now to the February 3, 1952 resolution of the Authority, we find that the admitted facts disclose no real emergency. A third bidding had been effected in which bids were submitted on January 19, 1953. This was for a contract period beginning March 1, 1953. It is noted, without resting our determination thereon, that the Authority, had it deemed the situation truly emergent, should have advertised for bids for a contract period beginning February 1, 1953 at the latest. It would seem that there would have been ample time to act on such bids between January 19, 1953, when they were submitted; and February 1, 1953.

This was not done, however, and in view of the fact that the judgment was rendered without the determination of the element of bad faith, as it was not essential to do so, it may be assumed for the purpose of this appeal that the Authority acted in good faith. The Authority's resolution of February 3, 1953 declared the existence of an emergency. It stated the approximate amount to be expended, namely, not more than $3,416.66 per day, and a total not in excess of $75,166.52 for a period beginning February 4, 1953 and to end when the litigation concerning the December 31, 1952 contract with Hudson, *ante*, should be brought to its ultimate conclusion. The resolution in these particulars complied with *R. S.* 40:50–1, *supra*, provided it was adopted by a four-fifths vote of the Authority. The resolution also purported to state the nature of the emergency, the remaining statutory prerequisite to the making of a contract without competitive bidding. The gist of the statements in the resolution concerning the nature of the

alleged emergency was "no contract for the removal of garbage and refuse * * * is operative * * * and the failure to remove the same shall constitute a menace to the public health and safety." There was contained in the resolution, however, no declaration that the Authority was unable to effect scavenger collections directly during the interim between February 3, 1953 and March 1, 1953, nor that there was any imminent danger to public health. The Authority could exercise the power to make scavenger collections directly under *R. S.* 40:66–1 by virtue of its status as a "political subdivision of the State * * * exercising public and essential governmental functions." *L.* 1948, *c.* 348, *sec. 7 (N. J. S. A.* 40:66A–7), *supra.* This power it obviously had. The record does not demonstrate that it could not effect collections of garbage and other refuse, but merely that it felt a contract with a certain private corporation was more advantageous. Further, the record demonstrates that the Authority was able to do the scavenger work directly and that it did so from February 6, 1953 to March 1, 1953. Upon these facts, and the application thereto of the principles of law hereinabove expressed, it is apparent that there was no real emergency on February 3, 1953 and that a true emergency was not described in the Authority's resolution of February 3, 1953. Therefore, no genuine issue of a material fact remained and summary judgment declaring the February 3, 1953 *per diem* contract with Hudson *ultra vires* was proper as a matter of law.

It follows that both Hudson's December 31, 1952 and February 3, 1953 contracts with the Authority, being *ultra vires,* were unenforceable against the Authority.

## IV. Pretrial Discovery

The next question involved is whether the trial court's denial of Hudson's application on March 19, 1953 for leave to take depositions of the individual plaintiff and of the officers of the corporate plaintiff was error. Under the circumstances of this case no abuse of discretion on the part

of the trial court or prejudice to the substantial rights of defendant Hudson is shown.

## V. QUANTUM MERUIT

Among the questions involved is Hudson's contention that it is entitled to a determination in this suit as to whether it is entitled to recover on the philosophy of *quantum meruit* for services actually rendered during the period between January 1, 1953 and February 5, 1953. The trial court in the present matter did not pass upon this question. It was raised by neither the complaint nor the amended complaint, and no cross-claim was interposed by defendant Hudson against the defendant Authority. Under these circumstances no expression of opinion thereon or determination thereof is made on this appeal.

As hereinbefore noted, it has been represented to this court that Hudson has filed an action in the Superior Court, Law Division, against the city and the Authority in which, *inter alia,* the claim on the *quantum meruit* is asserted. The judgment in this case should be so modified as to permit such action to proceed with respect to the alleged claim on the *quantum meruit* in accordance with applicable principles of substantive law and the appropriate rules of practice and procedure.

## VI. STATUS OF PLAINTIFFS

In Hudson's argument on the questions involved the plaintiffs' status to maintain the action *sub judice* is questioned. This is without merit as plaintiffs were taxpayers of the City of Jersey City. *Waszen v. City of Atlantic City,* 1 *N. J.* 272, 276 (1949).

## VII. INCIDENTAL QUESTIONS

The pleadings in this case and the briefs on appeal show that it was alleged by the plaintiffs that the defendants' activities were performed in bad faith. These allegations (which were categorically denied) did not enter into the

determination of the trial court, nor are they material here. Although there appear to be genuine issues as to some of the facts on these allegations, they are not material to the determination in this case and formed no part of the basis for the judgment rendered. Therefore summary judgment was proper. *R. R.* 4:58–3, formerly *Rule* 3:56–3.

## CONCLUSION

The judgment of the Superior Court, Law Division, granted summary judgment, which included the plaintiffs' prayer for restraint against the defendants the City of Jersey City and the Jersey City Incinerator Authority enjoining the said public bodies from "appropriating any moneys for the payment to Hudson and from making any payment to Hudson." The judgment should be amended to provide for relaxation or removal of such restraint in the event that Hudson prevails upon its claim for recovery on the *quantum meruit*, hereinbefore referred to, in its independent suit against the Authority. The mandate of this Court will therefore instruct the Superior Court, Law Division, to modify its judgment accordingly. In all other respects the judgment of the Superior Court, Law Division, is hereby affirmed.

OLIPHANT, J., concurring in result.

*For modification*—Chief Justice VANDERBILT, and Justices HEHER, OLIPHANT, WACHENFELD, BURLING, JACOBS and BRENNAN—7.

*Opposed*—None.