TOWNSHIP OF MOUNT OLIVE, A MUNICIPAL CORPORATION OF THE STATE OF NEW JERSEY, PLAINTIFF, v. THE MUSCON-ETCONG SEWERAGE AUTHORITY, A SEWERAGE AUTHORI-TY ORGANIZED PURSUANT TO THE LAWS OF THE STATE OF NEW JERSEY, DEFENDANT.

Superior Court of New Jersey
Law Division—Morris County

Decided November 5, 1979.

132

*Herbert A. Vogel* for plaintiff (*Vogel, Chait* and *Wacks,* attorneys).

*Larry I. Kron* for defendant Musconetcong Sewerage Authority (*Meyerson* and *Kron,* attorneys).

*Edward M. Dunne* for defendant Borough of Netcong (*Valentino* and *Sweeney,* attorneys).

There was no appearance for the Borough of Stanhope.

MacKENZIE, J. S. C.

In this action in lieu of prerogative writs, *R.*4:69 1 *et seq.,* the Township of Mount Olive (Mt. Olive) demands membership in the Musconetcong Sewerage Authority (MSA). The Borough of Netcong (Netcong) and the Borough of Stanhope (Stanhope) are the charter and the only member municipalities of the MSA. The MSA and Netcong oppose Mt. Olive's complaint. Construction of *N.J.S.A.* 40:14A 4(m)(i), a section of the Sewerage Authorities Law,[1] is necessary to resolve this litigation.

The MSA is a municipal corporation of New Jersey organized pursuant to the enabling statute. *N.J.S.A.* 40:14A 2(3) and *N.J.S.A.* 40:14A 4(a), (b) and (c). Created in 1967, the MSA operates a regional waste water collection and treatment system in the southeast portion of the Upper Musconetcong River drainage basin (basin). The MSA governing body is a board of six commissioners, three appointed by each member municipality.

A brief demographic and geographic description of the parties may be helpful. Mt. Olive, having an area of 31.5 square miles with a population of 18,000 and growing, is located in western Morris County. The intersection of I S 80 and Routes 46 and 206 roughly describes the northeast quadrant of Mt. Olive.

---

[1]The "Sewerage Authorities Law" is the short title of *L.*1946, c. 138, as amended and supplemented, which is codified as *N.J S.A.* 40:14A 1 *et seq.*

Inside this quadrant are 6.5 square miles and a population of 3,000. This is the proposed service area for which Mt. Olive seeks MSA membership. On the east, Mt. Olive adjoins Netcong, another Morris County community. Netcong has a population which has stabilized at 3,400 within its 0.80 square miles. Across the Musconetcong River, to the north of Netcong, lies Stanhope with its 3,800 residents in an area of 2.47 square miles.

The basin encompasses an area of some 64.23 square miles lying both in Morris County and Sussex County. The major water bodies and courses in the basin are the Musconetcong River, Lake Hopatcong and Lake Musconetcong. The political subdivisions within the basin and the percentage of in-basin land area compared to total municipal area are shown on this chart:

| Municipality | Area of municipality in basin | Percentage of municipality in basin |
|---|---|---|
| *Morris County* | | |
| Netcong | 0.08 sq. miles | 100% |
| Mt. Olive | 6.50 sq. miles | 21% |
| Township of Roxbury (Roxbury) | 3.44 sq. miles | 16% |
| Borough of Mt. Arlington | 1.90 sq. miles | 63% |
| Township of Jefferson | 14.3 sq. miles | 31% |
| *Sussex County* | | |
| Stanhope | 2.47 sq. miles | 100% |
| Borough of Hopatcong | 12.26 sq. miles | 100% |
| Township of Byram | 18.06 sq. miles | 87% |
| Township of Sparta | 4.50 sq. miles | 12% |

The total in-basin population is 43,000.

The MSA services all of Netcong, most of Stanhope, one garden apartment complex in Mt. Olive [2] and a shopping center in Roxbury.

[2] On May 30, 1974 the parties to this litigation consented to the entry of a judgment in the Chancery Division which allocated limited treatment capacity to the garden apartment site in Mt. Olive. See ' 25. By an agreed-upon formula, Netcong, Stanhope and Mt. Olive share capital costs, debt retirement and administrative and operating expenses.

The MSA, with federal and state funding, constructed the initial phase of the treatment system in 1968. The original treatment plant had a daily capacity of 500,000 gallons; it has since been expanded. An interceptor pipeline and force mains were also installed by the MSA. Netcong and Stanhope installed the collection and distribution pipelines within their corporate boundaries. The pipelines were then tied into the MSA system. Likewise, Roxbury and Mt. Olive own and maintain that part of the system, including granting sewers, pumping stations, force mains and metering devices, within their borders.

When demand for service increased, the MSA put a chemical additive plant into service. This temporary expedient was replaced in 1974 by a second treatment facility which also has a 500,000 gallon daily capacity. Thus, the MSA now has the daily capacity to treat 1,000,000 gallons of sewage. The first 500,000 was allocated by the MSA only to Netcong, Stanhope and Roxbury, but without imposition of a specific maximum daily usage. A different arrangement applies to the capacity of the second treatment plant. Usage was defined by an agreement, with daily capacity maximums set at:

| | | |
|---|---|---|
| Netcong | 82,500 [3] | gallons |
| Stanhope | 230,000 | " |
| Mt. Olive | 187,000 [3] | " |

Unhappy with its status as a mere user, Mt. Olive has been seeking MSA membership since 1976. In 1972 the New Jersey Department of Environmental Protection (DEP) had barred Mt. Olive from building its own treatment plant. Mt. Olive was compelled in the same year by the DEP to build an $800,000 trunk line to tie into the MSA treatment plant. The trunk line has the capacity to service the entire 6.5 square mile area in Mt. Olive.

---

[3]Netcong then allocated 2,500 and Mt. Olive allocated 7,500 gallons daily to the Roxbury Shopping Center as a result of other litigation.

On January 19, 1976 its governing body passed a resolution asking the MSA to expand by including Mt. Olive as a municipal member. The MSA turned down the application in March on the ground that Mt. Olive had failed to comply with the procedures set forth in the statute then in effect.[4] Nothing occurred during the next ten months. On January 25, 1977 the Mt. Olive Township Council adopted an ordinance proposing admission. The ordinance was forwarded to the MSA. In March a subcommittee was appointed by the MSA to study the request. The subcommittee recommended in May that the MSA take no action pending completion of a "201 facilities study."[5] The MSA commissioner accepted the subcommittee report and tabled the request for membership. In June Mt. Olive's governing body was advised of the MSA decision to defer consideration of the application. In September Mt. Olive filed its complaint.

By order of another judge of this court, the MSA held public hearings on December 2 and December 15 at which various witnesses testified. Mt. Olive was represented by counsel and was given an opportunity to be heard. At the end of the second

---

[4] *N.J.S.A.* 40:14A–4(m) was enacted by *c.* 11, § 1, and reenacted in *L.*1971, *c.* 73, § 1.

[5] The "201 facilities study" is a creation of the federal Water Pollution Control Act Protection Amendment, *P.L.* 92 500, 33 *U.S.C.A.* § 1251 *et seq.* The act, which is administered by the United States Environmental Protection Agency (EPA) requires facilities planning for water resource management, which includes evaluation of alternatives, of environmental impact and of cost effectiveness. The MSA was designated as the lead agency to make a "201 facilities study" by seven of the nine (excluding Sparta and Byram) Musconetcong River basin municipalities. The study, as approved by the MSA in August 1978, provides a timetable for planned expansion of the MSA system so as to protect the needs of all basin municipalities. Also provided for is expansion in membership of the MSA to include the nine municipalities. The act also requires approval of the study by the lead agency, the EPA and the appropriate state agency, which in New Jersey is DEP.

session the MSA commissioners voted unanimously to deny Mt. Olive's application pending approval of the "201 facilities study" by the EPA and the DEP. The study is used to determine the most cost-effective, environmentally acceptable waste water plan for the development of regional water pollution control facilities within the basin area. This study, which has since been accepted by the MSA and submitted to the EPA and DEP for approval, projects membership in the MSA for Mt. Olive. It is not known whether or when the two agencies will approve the plan.

*N.J.S.A.* 40:14A 4(m)(i),[6] the statute which all parties agree is controlling, reads as follows:

The governing body of any municipality which is contiguous to the district of a sewerage authority created by the governing bodies of two or more other municipalities may at any time, by ordinance duly adopted propose that the whole or any part of the area herein referred to as 'service area' within the territorial limits of such municipality shall be a part of said contiguous district. Such ordinance shall (1) state the number of members of the sewerage authority, not less than one nor more than three, thereafter to be appointed for full terms of office by the governing body of such municipality, and (2) determine that, after the filing of a certified copy thereof and of a resolution of the sewerage authority in accordance with this subsection, such service area shall be a part of said contiguous district. If thereafter a copy of such ordinance duly certified by the appropriate officer of such municipality, together with a certified copy of a resolution of said sewerage authority approving such ordinance, shall be filed in the office of the Secretary of State, then from and after such filing the service area shall forever be part of said contiguous district and said sewerage authority shall consist of the members thereof acting or appointed as in this section provided and constitute an agency and instrumentality of such municipality as well as such other municipalities. The governing body of the said municipality so becoming part of said contiguous district shall thereupon appoint members of the sewerage authority in the number stated in such ordinance, for periods and

---

[6]*L.*1975, *c.* 381, § 1, eff. March 3, 1976.

in the manner provided for the first appointment of members of a sewerage authority under subsection (c) of this section.

The statute has never been construed.

Mt. Olive contends that any municipality which is adjacent to the district serviced by a regional sewerage authority is unqualifiedly entitled to membership in that authority when the procedural requirements are met. The MSA, joined by Netcong, contends its withholding of consent is an unreviewable legislative function of a regional sewerage authority. They argue, in the alternative, that Mt. Olive is not automatically entitled to membership because the statutory prerequisites have not been met and because Mt. Olive's reading of the statute would necessarily lend to a patently absurd result.

The Legislature does seem to assume that a sewerage authority will not act in any other manner except to approve the application of the applying municipality. Even so, no specific procedure for approval is spelled out. Does the statute then provide no latitude for a denial by the sewerage authority?

Consent to the ordinance proposing admission to the sewerage authority is part of a statutory admission procedure. However, had the Legislature intended the giving of that consent to be a mere ministerial formality, it would have used a clear expression of such intent. The Legislature could have ordered and directed such consent to be given by an authority. But, the operative words in the statute imply discretion, not mandatory affirmative action, *i. e.,* "may," "propose," "if," "then." Words used in a statute should be given their common meaning absent a contrary instruction from the legislature. *Fahey v. Jersey City,* 52 *N.J.* 103, 107 (1968); *Scatuorchio v. Jersey City Incinerator Auth.,* 14 *N.J.* 72, 87 (1953). There is no contrary intention indicated in statute. Given the ordinary meaning of these words, the statutory scheme is to permit, but not to require, the authority to admit a petitioning municipality.

The legislative inference is clear that a vote to admit carries with it the option to accept or reject such a resolution.

Here, the legislation authorized and empowered a sewerage authority to adopt a resolution consenting to the admission. While the statute does not contain mention of rejection of an applicant, the fair implication is that the Legislature was allowing for, but not requiring, the consent to be given by the authority. *Cf. Lomarch Corp. v. Englewood,* 51 *N.J.* 108, 113 (1968); *Juzek v. Hackensack Water Co.,* 48 *N.J.* 302, 314 315 (1966). The power to withhold that consent was impliedly vested in the sewerage authority as the representative of the charter member municipalities. The statute does not describe a procedure for, nor a substantive basis for, rejection. However, consent necessarily implies an intentional, voluntary act, not a statutorily-compelled act. The statute providing jurisdiction to do an act does not by that fact alone mandate the doing of the act.

Subsection (m)(i) of *N.J.S.A.* 40:14A 4 requires that the ordinance of the contiguous municipality must be filed in the office of the Secretary of State together with a certified copy of the resolution of the sewerage authority. It further provides: " . . . If thereafter a copy of such ordinance duly certified by the appropriate officer of the municipality, together with a certified copy of a resolution of said sewerage authority approving such ordinance shall be filed. . . . " The statutory language represents a legislative scheme to provide the mechanism for approval or disapproval by a regional authority of the ordinance of a contiguous municipality proposing to become a member of the authority.

The result would be patently absurd should the statute be interpreted as Mt. Olive argues. The consequences of Mt. Olive's argument for automatic admission of any petitioning contiguous municipality would be an ever-expanding sewerage authority. As one municipality petitions and is automatically accepted for membership, different municipalities would become contiguous. As these new municipalities adopt similar ordinances proposing membership, their enrollment in the authority

would become automatic. It would then be possible for growth of the authority to continue indefinitely (with its possible outer boundary being the borders of our State), without relation to a sewerage authority's facilities or ability to accept such expansion. The Legislature could never have intended such a ridiculous result. *Cf. Roman v. Sharper,* 53 *N.J.* 338 (1969); *Restaurant Enterprises, Inc. v. Sussex Mut. Ins. Co.,* 52 *N.J.* 73 (1968).

A power which is delegated in general terms implies a limitation that its exercise will be reasonable. The Legislature has authorized the creation and expansion of a multi-municipal authority to meet regional sewerage needs, not a private club. Thus, the power to consent to admission may not be unreasonably withheld by the MSA. *See Application of Howard Savings Inst. of Newark,* 32 *N.J.* 29, 52 (1960); *Gloucester v. Public Employees Rela. Comm'n,* 107 *N.J.Super.* 150, 156 (App.Div. 1969), aff'd 55 *N.J.* 333 (1970).

A similar issue confronted the Supreme Court in *West Point Island Civic Ass'n. v. Dover Tp. Comm.,* 54 *N.J.* 339 (1969). A group of citizens sought deannexation from Dover Township. The trial court found for the township by construing the deannexation statute, *N.J.S.A.* 40:43 26, to confer upon the municipality an absolute right of disapproval. The Supreme Court disagreed, holding that "the right to withhold consent is not absolute, but rather such consent must not 'be unreasonably or arbitrarily withheld.' " *Id.* at 343.

In rejecting the contention that deannexation was strictly a legislative function into which the power of the judiciary should not be interjected, the Supreme Court defined the scope of judicial review:

There are several reasons for upholding a broad judicial review of municipal decision-making. First, there can be no usurpation by the courts of a legislative function, as defendant claims, when every municipal power is the product of a statutory grant. It is the traditional duty of the judicial branch of government, in interpreting statutes, to ascertain the scope of delegated discretion. See L.

Jaffe, *Judicial Control of Administrative Action*, 181 (1965). Second, where the grant of discretion is general in its terms, as here, judicial review is especially warranted in order to assure that legally irrelevant or forbidden considerations have not determined the decision. *Grogan, supra* (*Grogan v. DeSapio*, 11 *N.J.* 308); *Donohue v. Campbell*, 98 *N.J.L.* 755, 763 (E. & A.1923); *The DeMott Homes at Salem, Inc. v. Margate City*, 136 *N.J.L.* 330, 333 35 (Sup.Ct.1947). Third, judicial review of decisions of local governing bodies is called for when, as here, such decisions will affect the state-wide legislative scheme for deannexation of land from one municipality and annexation to another. See Note, *supra, Harv.L.Rev.* at 1604. Otherwise, the municipality in which the land is located by mere whim could thwart the purpose of the annexation statute. In sum, in a case such as the present one our courts have the power, and the duty, to determine whether a challenged municipal action, albeit the product of an exercise of discretion, is reasonable under the circumstances. See 5 *McQuillin, Municipal Corporations*, §§ 18.01, *et seq.* (3d ed. 1949). [at 346 347]

Likewise, the sewerage authority act is a legislative enactment which provides for the nature and extent of power conferred by the State upon the local governmental unit, a regional authority. The statute, *N.J.S.A.* 40:14A 4(m)(i), sets forth the procedure for enlarging a sewerage district by integrating all or part of a contiguous municipality. The governing body of the municipality must first adopt and then transmit the petitioning ordinance to the regional authority. However, the authority must give its approval to the ordinance by passing its resolution of acceptance. Only after the ordinance and resolution are filed with the Secretary of State is the process of admitting the new municipal member of the authority complete. Where the authority's power is the product of a statutory grant, it is ". . . [t]he traditional duty of the judicial branch of government in interpreting statutes to ascertain the scope of delegated discretion. . . ." *Id.* at 346. I conclude that an authority's decision to adopt a resolution of approval is a discretionary act, which is reviewable for abuse by the court.

■ Netcong's further argument that a prerogative writ action in lieu of *mandamus* will not lie in this case is meritless.

The Supreme Court demolished the same argument raised by Dover Township in the deannexation decision.

> Nor can the Township avail itself of the argument that ordinarily an action in lieu of the prerogative writ of mandamus will not lie in order to force a legislative body to exercise its law-making function. This is another form of the same argument discussed above with regard to judicial review. *Since an abuse of delegated discretion would undermine the statutory deannexation scheme, a court must have the power to review these kinds of municipal decisions, and correct abuses by an action in lieu of the prerogative writs.* [At 347; emphasis supplied]

The Supreme Court in *Kohler v. Cobb*, 31 *N.J.* 369 (1960), a factually inapposite case, also determined that sewerage authorities are subject to statutory principles applicable to municipal corporations, including defending against prerogative writ actions. In *Kohler* a prerogative writ action was brought against the Avalon Sewerage Authority.[7] Justice Schettino, quoting from *Camden Cty. v. Pennsauken Sewerage Auth.,* 15 *N.J.* 456, 464-465 (1954), wrote:

> The . . . authority, like the municipality which gave it being, is yet an agency or instrumentality for local administration in the vital field of sanitation and health, an area of government that is a primary responsibility of the municipality itself. . . . it is . . . the *alter ego* of the municipality in the service of this essential public need. [31 *N.J.* at 373]

The MSA, like the municipalities which have given it existence, is also an agency or instrumentality for local administration in the vital fields of sanitation and health, an area of government that is a primary responsibility of the member municipalities themselves.

---

[7]No distinction is perceived even though the Avalon Sewerage Authority was a single, not a multi-municipal district. The empowering statutes come from the same basic statutory source and are parallel in language. Compare *N.J.S.A.* 40:14A–4(b) with *N.J.S.A.* 40:14A 4(c).

The *Kohler* opinion goes on to point out the declaration of the statute that the authority is "a public body corporate and politic." *Cf. West Caldwell v. Caldwell*, 26 *N.J.* 9, 31 (1958). This language is contained in both the statutes for a single municipal sewerage authority as well as a multi-sewerage authority.

The question thus becomes: Was the MSA refusal to admit Mt. Olive an abuse of discretion? Geographic, historical, and demographic reasons support Mt. Olive's bid. The treatment plant is in Mt. Olive. A portion of the township is now serviced by the MSA as a customer with a set allocation of treatment capacity. In fact, the present service area in Mt. Olive equals two-thirds of the MSA's entire present service area, and the population within the Mt. Olive service area is equal to the population in Netcong and Stanhope. Mt. Olive contributes to the debt charges and maintenance costs of the authority. Finally, Mt. Olive has built a trunk line which ties into the MSA treatment plant.

On the other hand, the MSA has considered these positive aspects. One of the MSA commissioners expressed the consensus when he remarked at the December 15, 1977 public hearing: "We do expect to invite Mt. Olive in but . . . I see no reason why they should come in . before anyone else." The MSA had a compelling reason for rejecting Mt. Olive—the need for a fully approved "201 facilities plan." The Federal Government, through legislation and agency administration, has exhibited an interest in protecting watersheds through construction and operation of regional, integrated collection and treatment systems. In addition to the code provisions previously referred to, Congress passed further amendments to the Federal Water Pollution Act [8] to encourage through guidance and funding a calculated construction of new pollution control facilities, so long as they are environmentally sound and cost-effective.

---

[8]*P.L.* 93-207 and *P.L.* 93 243, both codified as 33 *U.S.C.A.* 1251 *et seq.*

The cornerstone of the federal legislation remains the regionalized "201 facilities plan" which provides focus for means of sewerage disposal, water reuse, flow reduction measures, environmental impact and phased construction, as well as consideration for operation and maintenance.

The MSA "201 facilities study" was evaluated and approved by the authority, and forwarded to the federal and state agencies for review, as required by Congress. The study contains a detailed implementation schedule which, if followed, will allow for the collection, transmission and treatment of waste water in the basin according to federal standards. But for funding, signed allocation agreements must precede agency approval. Even if they were to do so, crucial to the ultimate success of the resource management program is an equitable allocation of system capacity among all nine in-basin municipalities. Allocation and service contracts must be negotiated with the aim of serving all the residents, not just a favored or assertive few. All nine affected municipalities are entitled to discussion and evaluation of, and agreement to, capacity allocations. When all planning elements are approved, service will be extended in stages to the entire drainage area.

With the signing of service and allocation agreements, the MSA will be committed to admitting such of the seven additional municipalities as wish membership. Expansion will require reorganization and adjustment of the number of municipal commissioners. The number of commissioners to be named from each municipality will undoubtedly depend on which municipalities are admitted. It is clear that the MSA, in good faith and with sound planning judgment, has provided for a schedule for orderly expansion of both its service area and its municipal membership.

In addition to planning for the common good of the basin, the MSA has given consideration to Mt. Olive's special situation in four ways. First, public response from Mt. Olive has been received during the initial planning phase. Secondly, Mt. Olive's

interest in the outcome of the planning process does not stand significantly higher than the interests of other nonmember basin municipalities. The MSA is faced with decisions as to its future and the future of the entire Musconetcong River basin. Mt. Olive is not alone in its demand for sewerage allocation. Allocation is a cause for concern for all nine towns. In addition, Mt. Olive's northeast quadrant is only a limited portion of the overall basin area (10%) and population (7%) to be served by the MSA. Thirdly, no immediate harm or prejudice to Mt. Olive's internal development has been shown. There have been no loss of potential ratables, nor have any building permits been held up because of lack of plant capacity allocated to Mt. Olive. Finally, Mt. Olive's right to access to the treatment plant will continue, unaffected by the MSA decision to reject present membership, while the regulatory agencies scrutinize the "201 facilities plan." Rejection was not unreasonable.

The issue of membership will be decided, the MSA pledges, for the benefit of all concerned municipalities, not just one. The decision may be expected to be based on an analysis of all relevant data affecting the basin. Rejection now is no different from a temporary moratorium on membership. *Cf. New Jersey Shore Builders v. Ocean Tp.,* 128 *N.J.Super.* 135 (App.Div.1974). Under these circumstances, rational reasons to defer membership application existed. The MSA weighed the factors, *pro* and *con*, before turning down Mt. Olive. Its decision is fairly sustainable on the record. *Cf. Kenwood Assoc. v. Engelwood Bd. of Adj.,* 141 *N.J.Super.* 1 (App.Div.1976).

Judgment dismissing the complaint will be entered. Should the MSA, upon receiving DEP and EPA approval of its "201 facilities study," not permit expansion of its membership to include Mt. Olive, further judicial action may be sought by supplemental pleading in this cause. *Cf. South Burl. Cty. NAACP v. Mt. Laurel Tp.,* 67 *N.J.* 151, 192 (1975).