NEW JERSEY TURNPIKE AUTHORITY, PLAINTIFF-RE-
SPONDENT, v. THEODORE D. PARSONS, ATTORNEY
GENERAL OF THE STATE OF NEW JERSEY, DEFEND-
ANT-RESPONDENT, AND SPENCER MILLER, Jr., STATE
HIGHWAY COMMISSIONER OF THE STATE OF NEW
JERSEY, DEFENDANT-APPELLANT.

Argued October 24, 1949—Decided December 5, 1949.

*Mr. Frank A. Mathews, Jr.,* argued the cause for the appellant, Spencer Miller, Jr., State Highway Commissioner.

238

*Messrs. Augustus C. Studer, Jr.,* and *G. W. C. McCarter* argued the cause for the respondent, New Jersey Turnpike Authority.

*Mr. Osie M. Silber* argued the cause for the respondent, Theodore D. Parsons, Attorney General.

The opinion of the court was delivered by

VANDERBILT, C. J.   The New Jersey Turnpike Authority filed a complaint in the Law Division of the Superior Court for a declaratory judgment to determine the constitutionality of the New Jersey Turnpike Authority Act (*P. L.* 1948, *c.* 454, as amended and supplemented by *P. L.* 1949, *cc.* 40 and 41; *R. S.* 27:23–1 *et seq.*).   The Attorney General and the State Highway Commissioner were made defendants.   The trial judge sustained the constitutionality of the act, and the State Highway Commissioner petitioned for certification, which has been granted.

By the terms of this legislation, there is created "in the State Highway Department a body corporate and politic, with corporate succession, to be known as the 'New Jersey Turnpike Authority,' " consisting of three members appointed by the Governor, with the advice and consent of the Senate, *R. S.* 27:23–3.   The Authority is created for the purpose of facilitating "vehicular traffic   *   *   *   and to provide for the construction of modern express highways."   It is authorized to construct, maintain, repair and operate turnpike projects "at such locations as shall be established by law" and empowered "to issue turnpike revenue bonds of the Authority, payable solely from tolls and revenues, to finance such projects," *R. S.* 27:23–1.   It is provided that the turnpike revenue bonds "shall not be deemed to constitute a debt or liability of the State   *   *   *   or a pledge of the faith and credit of the State," and unless payment is made by refunding, the principal and interest thereof "shall be payable solely from the   *   *   *   (tolls and revenues) pledged for their payment," a legend to this effect being required to be set forth expressly on the face of the bonds, *R. S.* 27:23–2.

In addition to an explicit grant of customary corporate powers, the Authority is authorized specifically and generally to do all things which may be necessary and incidental to the construction, maintenance, repair and operation of turnpike projects, including that of acquiring "by purchase or otherwise * * * or by the exercise of the power of eminent domain and in accordance with the provisions of law, in so far as such provisions may be applicable, such public lands * * * highways or parkways * * * and any fee simple absolute or any lesser interest in private property," *R. S.* 27:23–5. The State Highway Department is "authorized in its discretion to expend out of any funds available for the purpose such moneys as may be necessary" for preliminary engineering, traffic and other expert studies, as well as to use its own personnel, in connection with any turnpike project or projects, the funds so expended to be "reimbursed by the Authority to the department from the proceeds" realized from the sale of bonds for said turnpike project or projects, *R. S.* 27:23–17.

The Legislature having authorized the construction of a specific turnpike project (*P. L.* 1949, *c.* 41; *R. S.* 27:23–23, 24) and the preliminary engineering and other studies for it having already been commenced, the Authority is desirous of issuing its turnpike revenue bonds in a sum not less than $175,000,000 to finance the project. In this connection questions have been raised as to the constitutionality of the Turnpike Authority Act that would seriously affect the marketability of the proposed bond issue. To settle these doubts the Authority thereupon initiated the present proceeding under the Declaratory Judgments Act (*R. S.* 2:26–66 *et seq.*).

▆▆ The first question that confronts us is whether or not a proceeding under the Declaratory Judgments Act is available here. The remedial purpose of the Act is "to settle and afford relief from uncertainty and insecurity with respect to rights, status and other legal relations," *R. S.* 2:26–67. The Act merely broadens the rationale of remedies long cognizable in equity, such as those "to settle doubts about the construction of a will * * *; or * * * to quiet title,

or a bill of peace," *In re Van Syckle,* 118 *N. J. L.* 578, 580 (*E. & A.* 1937). To serve these ends it is provided that "All courts of record in this state shall * * * have power to declare rights, status and other legal relations," *R. S.* 2:26–68, and particularly to determine "any question of construction or validity arising under * * * (a) statute * * *," *R. S.* 2:26–69. The remedy thus provided, however, is circumscribed by the salutary qualification that the jurisdiction of the courts may not be invoked in the absence of an actual controversy. "Not only must the plaintiff prove his tangible interest in obtaining a judgment, but the action must be adversary in character, that is, there must be a controversy between the plaintiff and a defendant, subject to the court's jurisdiction, having an interest in opposing his claim." *Borchard, Declaratory Judgments* (2d ed. 1941), *p.* 29; *Cf. New Jersey Bankers Ass'n v. Van Riper,* 1 *N. J.* 193 (1948). We use the phrase "salutary qualification" because of the understandable policy of the courts to refrain from rendering advisory opinions, from deciding moot cases, or generally from functioning in the abstract, and "to decide only concrete contested issues conclusively affecting adversary parties in interest," *Borchard, pp.* 34-35.

In the present proceeding highly significant issues that vitally affect the state and its citizens are presented for determination. That the plaintiff, New Jersey Turnpike Authority, has a clear interest in all phases of the challenged legislation sufficient to enable it to maintain this suit is too obvious to require comment. Similarly the State Highway Commissioner in the light of his general supervision over the construction and maintenance of state roads and highways, *R. S.* 27:1–1 *et seq.,* is an indispensable defendant. His adverse interest is evident not only from the fact that the legislation under attack is generally in derogation of his jurisdiction but also because of his peculiar interest arising from the section making it possible for the Turnpike Authority to use the personnel and funds of his department for preliminary studies, *R. S.* 27:23–17. The Attorney General who, in effect, concedes the constitutionality of the legislation is a necessary

party by virtue of *R. S.* 2:26–72, which requires that he "shall also be served with a copy of the proceeding and be entitled to be heard" whenever a statute shall be alleged to be unconstitutional.

The first point to be considered in any proceeding for a declaratory judgment is whether or not the controversy that is presented in the briefs and at the oral argument is actual and *bona fide* or is merely one in which "the semblance of judicial proceedings and the form of due process are present," *New Jersey Bankers Ass'n v. Van Riper,* 1 *N. J.* 193, 198 (1948). We have studied the briefs and have considered the oral argument of the parties and we are satisfied that within the limits of the issues here raised a justiciable controversy exists that is ripe for judicial determination.

The main challenge to the constitutionality of the Turnpike Authority Act is predicated on the provisions of Article VIII, Section II, paragraph 3, of the Constitution of 1947, the pertinent portion of which reads as follows:

"3. The Legislature shall not, in any manner, create in any fiscal year a debt or debts, liability or liabilities of the State, which together with any previous debts or liabilities shall exceed at any time one per centum of the total amount appropriated by the general appropriation law for that fiscal year, unless the same shall be authorized by a law for some single object or work distinctly specified therein. Regardless of any limitation relating to taxation in this Constitution, such law shall provide the ways and means, exclusive of loans, to pay the interest of such debt or liability as it falls due, and also to pay and discharge the principal thereof within thirty-five years from the time it is contracted; and the law shall not be repealed until such debt or liability and the interest thereon are fully paid and discharged. No such law shall take effect until it shall have been submitted to the people at a general election and approved by a majority of the legally qualified voters of the State voting thereon."

The Turnpike Authority Act, however, makes no pretense of attempting to comply with the terms of this paragraph of the Constitution. If the bonds sought to be issued under the Act were held to be within the scope of the quoted constitutional provision, they would manifestly be void because the contemplated amount of indebtedness greatly exceeds one per

centum of the total state appropriation for the fiscal year. The Act, moreover, has not been submitted to the people by referendum; indeed, there is no provision in it or elsewhere in the statutes authorizing any such referendum.

To bring the proposed bond issue under the ban of the Constitution it must first appear that the bonds will "create * * * a debt or debts, liability or liabilities of the State." This the Turnpike Authority Act does not do. On the contrary, the explicit and unambiguous language of the statute entirely negatives any possibility of the proposed bonds being an any manner debts or liabilities of the State by providing in so many words that the bonds of the Turnpike Authority "shall not be deemed to constitute a debt or liability of the State * * * or a pledge of the faith and credit of the State." To dispel any lingering doubts, the Legislature expressly provided that "such bonds, unless refunded by the bonds of the Authority created in this Act, shall be payable solely from the funds pledged for their payment as authorized herein," *R. S.* 27:23–2. The funds so pledged are stated in section 7 of the Act to be the "tolls and revenues of all or any part of the turnpike project financed in whole or in part with the proceeds of such issue or with the proceeds of bonds refunded or to be refunded by such issue." Any opportunity for the slightest misunderstanding on the part of any purchaser of the bonds has been obviated (*R. S.* 27:23–2):

"All such turnpike revenue bonds shall contain on the face thereof a statement to the effect that the Authority is obligated to pay the same or the interest thereon only from the tolls or revenues pledged for their payment and that neither the State nor any political subdivision thereof is obligated to pay the same or the interest thereon and that neither the faith and credit nor the taxing power of the State or any political subdivision thereof is pledged to the payment of the principal of or the interest on such bonds."

Still further negativing any ground for holding the State liable for the activities of the Turnpike Authority is the next paragraph of the Act, which goes beyond the matter of the bonds of the Turnpike Authority and the funds pledged for

their payment to deal with all of the financial transactions of the Turnpike Authority:

"All expenses incurred in carrying out the provisions of this act shall be payable solely from funds provided under the authority of this act and nothing in this act contained shall be construed to authorize the Authority to incur indebtedness or liability on behalf of or payable by the State or any political subdivision thereof."

■ In spite of this plain declaration of legislative intent, counsel for the State Highway Commissioner argues earnestly that because the State created the Turnpike Authority, the State is, as a matter of law, responsible for its debts. This view flies in the face of long established principles with respect to the status of public corporations in the field of government. Though created by the State and subject to dissolution by the State, they are in the eyes of the law independent entities and the State is not responsible for their debts and liabilities, whether they be municipal corporations or counties or such specialized bodies as the Port of New York Authority; *Cf. California Toll Bridge Authority v. Wentworth*, 212 *Cal.* 298, 298 *Pac.* 485 (1931). The fact that the members of the Turnpike Authority are appointed by the Governor with the advice and consent of the Senate rather than elected by the voters in nowise alters the status of the Turnpike Authority as an independent corporate entity any more than does the similar appointment of the members of the Port of New York Authority, *R. S.* 32:2–3, or the members of the Interstate Sanitation Commission, *R. S.* 32:19–1. The argument advanced is in effect an effort to apply the doctrine of piercing the veil of the corporate fiction used in the field of private corporations to prevent the fraudulent abuse of the device of incorporation at the expense of innocent parties, to the field of public law, where it is unknown and in circumstances where, instead of fraud and concealment, there is the utmost disclosure of the exact nature of the bonds being authorized not only by the enactment and publication of the statute here under review but by an appropriate legend on the face of each turnpike revenue bond. It is also objected that the

Turnpike Authority is the *alter ego* of the State and not a self-sufficient public corporation because it is a body corporate and politic "in the State Highway Department," *R. S.* 27:23-3. This statutory provision is manifestly intended to be a compliance with the constitutional provision requiring that "all executive and administrative offices, departments, and instrumentalities of the State government, including the offices of Secretary of State and Attorney General, and their respective functions, powers and duties, shall be allocated by law among and within not more than twenty principal departments," *Article V, Section IV, paragraph* 1. But the State Highway Commissioner is given no authority whatsoever over the Turnpike Authority. The Turnpike Authority is in but not of the State Highway Department and that fact does not make it any the less an independent entity, as the language of the entire Act clearly demonstrates.

The appellant relies much on *Wilson v. State Water-Supply Commission,* 84 *N. J. Eq.* 150 (*E. & A.* 1915), which arose under a provision in the 1844 Constitution similar to that under consideration here. The rationale of the *Wilson case* was aptly summarized by Mr. Justice Case in *Hudson County v. State House Commission,* 130 *N. J. L.* 90, 93 (*Sup. Ct.* 1943):

"The decision of the Court of Errors and Appeals in the cited case, as we understand it, went upon the theory that the land which the State Water Supply Commission undertook to purchase was to become state property; that the purchase price amounting to $1,000,000 was to be met by setting up a mortgage debt upon the lands; that the debt was a debt of the state; that whether or not the debt thus incurred on behalf of the state was to be collected from a particular fund or even if it was not an enforceable debt was beside the point, as it was nevertheless a debt of the state and the prohibition of the constitution therefore ran against it; that contributing appropriations from the state treasury were anticipated and that the appropriations so to be made would clearly be in payment of the debt. Upon these considerations the court concluded that the contract created an indebtedness in violation of the constitutional provision."

The statute under attack in the *Wilson case* differed in essential provisions from the Act here under review. In the

first place, the State Water-Supply Commission, though styled a body corporate, *P. L.* 1912, *c.* 318, § 1, *p.* 557, was not an autonomous body with respect to the project therein authorized but, on the contrary, it was powerless to act in the matter without the consent of the governor, and its actions were subject to a review by the former Supreme Court that was unusual, if not unique, in this State, as appears from section 4 (*p.* 560) of the statute last cited:

"4. The powers herein conferred on the State Water-Supply Commission * * * shall only be exercised when consented to by the Governor of the State of New Jersey, and no contract, obligation, bond or mortgage executed in pursuance of the provisions hereof shall be valid unless the Governor of the State of New Jersey shall consent to the same, and every such contract, obligation, bond or mortgage shall be subject to review by the Supreme Court as to the reasonableness and fairness of the terms and conditions thereof."

The statute here under review contains no such provisions crippling, if not destroying, the status of the Turnpike Authority as a public corporation. Secondly, the property of the State Water-Supply Commission might be foreclosed, *P. L.* 1912, *c.* 318, § 2, *p.* 559, whereas the holders of turnpike revenue bonds of the Turnpike Authority are given no such right. On the contrary, the Turnpike Authority Act specifically provides that the resolution providing for the issuance of bonds "shall not convey or mortgage any turnpike project or any part thereof." *R. S.* 27:23–8. In the third place, the Court of Errors and Appeals laid great stress on the fact that the contract there under review provided for a sinking fund for the payment of the mortgage debt, the first source of which was:

"1. Any and all moneys which shall from time to time be appropriated by any legislature of the State of New Jersey toward the principal of said bonds or any part thereof." 84 *N. J. Eq.* 150, 159.

There is no such provision in the statute here under review, but on the contrary, as before indicated, all expenses of the Turnpike Authority are payable solely from the funds authorized by the Turnpike Authority Act, and nothing in the Act

is to be construed to authorize it to incur any indebtedness on behalf of the State. We therefore conclude that the Act under review is not subject to the infirmities that destroyed the statute involved in the *Wilson case*.

It has been urged on us in support of the constitutionality of the Turnpike Authority Act that its bonds would have been valid even if the Legislature had not set up the New Jersey Turnpike Authority as a body corporate and politic and even if the bonds were in fact direct obligations of the State. This assertion is based on the Special Fund Rule, the theory of which is that the purpose of a debt limitation in a constitution is to protect the people of the state from the exercise of the taxing power to pay obligations of the state, and therefore such a constitutional provision is not impinged upon by bonds that are payable solely from the revenues of the project to be built with the proceeds of the bonds. There is, however, no need for us to consider this doctrine, for the Act makes it clear beyond any possibility of dispute that it was the legislative intent to create an autonomous public corporation and to give it, as distinguished from the State, the power to issue turnpike revenue bonds.

The next attack is on Section 17 of the Act:

"The State Highway Department is hereby authorized in its discretion to expend out of any funds available for the purpose such moneys as may be necessary for the study of any turnpike project or projects and to use its engineering and other forces, including consulting engineers and traffic engineers, for the purpose of effecting such study and to pay for such additional engineering and traffic and other expert studies as it may deem expedient, and all such expenses incurred by the department shall be paid by the department and charged to the appropriate turnpike project or projects, and the department shall keep proper records and accounts showing each amount so charged. Upon the sale of turnpike revenue bonds for any turnpike project or projects, the funds so expended by the department in connection with such project or projects shall be reimbursed by the Authority to the department from the proceeds of such bonds.

"Any obligation or expense hereafter incurred by the State Highway Department with the approval of the Authority for traffic surveys, borings, preparation of plans and specifications, and other engineering services in connection with the construction of a project shall be regarded as a part of the cost of such project and shall be reimbursed to the State out of the proceeds of bonds herein authorized."

Under this section the State Highway Commissioner has already advanced substantial sums of money to the State Turnpike Authority and has given it the benefit of considerable engineering and other services. This, it is charged, violates Article VIII, Section 2, paragraph 1, of the Constitution: "The credit of the State shall not be directly or indirectly loaned in any case."

It was at first argued on behalf of the Turnpike Authority that the sums of money turned over to it and the services rendered on its behalf by the State Highway Commissioner did not come within the purview of the constitutional provision because the words "credit" and "loaned" were to be literally construed to relate only to transactions in which the State became a guarantor. It was also insisted that an expenditure by the State Highway Department out of its own funds for the benefit of a public corporation such as the Turnpike Authority cannot be deemed a loan of the State's credit, but this narrow view ignores entirely the provisions of Article VIII, Section II, paragraph 2, of the Constitution providing that "no money shall be drawn from the State treasury but for appropriations made by law." No appropriation was made by the Legislature to the State Turnpike Authority; had there been, it might well have caused the Authority to fall within the scope of the *Wilson case*. The Turnpike Authority cannot blow hot and cold in the same breath; it either is an autonomous corporation or it is not.

Nor has the State Highway Commissioner the right to divert funds appropriated to the State Highway Department or to render services for a project that is not within the scope of the duties confided to his Department. Whatever engineering or related services he may have supplied cannot conceivably relate to the work of his Department. The contemplated turnpike will cost so many times his total annual appropriation that it could not possibly be a project of his Department. Section 17 provides that upon the sale of bonds by the Authority the funds expended by the State Highway Department shall be reimbursed to the Department by the Authority, but any obligation or expense incurred by the

State Highway Department for engineering services shall be reimbursed not to the State Highway Department but to the State. Thus whatever sums may be expended by the State Highway Department for traffic surveys, borings, preparation of plans and specifications and other engineering services, will never come back into the funds of the State Highway Department and its funds will therefore be permanently reduced by the amount of any such contributions to the work of the Turnpike Authority.

Nor can the delegation to the discretion of the State Highway Commissioner of how much of his funds shall be turned over to an autonomous public corporation be justified. It would be possible for the State Highway Commissioner year by year to turn over all of his funds to the Turnpike Authority. The raising of revenue and the making of appropriations are peculiarly within the legislative province. By placing this power in the hands of the State Highway Commissioner, the Legislature is, *pro tanto,* abdicating its power over the purse strings to a department head. The force of these considerations, developed at the oral argument, led counsel for the Turnpike Authority to concede, in effect, the unconstitutionality of Section 17 and to rely on the severability clause in *R. S.* 27:23–20. Very obviously, this Act may be given effect without Section 17, the provisions of which are merely temporary and incidental to the over-all purpose of the Act. We therefore conclude that although Section 17 is invalid, its invalidity does not affect the other parts of the Act.

Finally, it was urged on us at the oral argument that the Turnpike Authority Act is unconstitutional in that it confers on the Authority the power to condemn state property and counsel were interrogated on this issue. This argument is predicated on the words "public lands" in *R. S.* 27:23–5(j):

"5. General grant of powers. The Authority shall be a body corporate and politic and shall have perpetual succession and shall have the following powers:

&ast;          &ast;          &ast;          &ast;          &ast;          &ast;          &ast;

"j. To acquire in the name of the Authority by purchase or otherwise, on such terms and conditions and in such manner as it may

deem proper, or by the exercise of the power of eminent domain and in accordance with the provisions of law, insofar as such provisions may be applicable, such *public lands*, parks, playgrounds, reservations, highways or parkways, or parts thereof or rights therein and any fee simple absolute or any lesser interest in private property, and any fee simple absolute in, easements upon, or the benefit of restrictions upon, abutting property to preserve and protect turnpike projects;"

It is provided by Section 14, however, that (*R. S.* 27:23–14) :

"* * * all public departments, agencies and commissions of the State of New Jersey, notwithstanding any contrary provision of law, are hereby authorized and empowered to lease, lend, grant or convey to the Authority at its request upon such terms and conditions as the * * * departments, agencies or commissions of the State may deem reasonable and fair and without the necessity for any advertisement, order of court or other action or formality, other than the regular and formal action of the authorities concerned, any real property which may be necessary or convenient to the effectuation of the authorized purposes of the Authority, including public roads and other real property already devoted to public use."

Reading the provisions of these two sections together, we do not construe Section 5 (j) as granting any power of general condemnation of property owned or held by the State. In the light of the detailed directions for the acquisition of state property by lease, loan, grant or conveyance contained in Section 14 and the absence of a clear and unambiguous grant of authority to the Turnpike Authority to take state property by condemnation, we cannot properly infer the existence of the power of eminent domain as to state property in the Turnpike Authority.

"Although there is now no question that the legislature has the power to authorize the taking of land devoted to one public use for a different public use, such a taking cannot be made under a general delegation of the power of eminent domain from the legislature, unless it can be clearly inferred from the nature and situation of the proposed work, and from the impracticability of constructing it without encroaching on land already used by the public, that the legislature intended to authorize such property to be taken, and the same is true of property owned or held by the state even though not devoted to a public use." *II Nichols on Eminent Domain*, § 361, *p.* 995 (1917).

The judgment of the Law Division is modified to the extent of declaring Section 17 of the Turnpike Authority Act (*P. L.* 1948, *c.* 454, § 17; *R. S.* 27:23–17) .unconstitutional and void, and it is affirmed in all other respects.

HEHER, J. (dissenting in part). I perceive no constitutional infirmity in the Turnpike Authority Act. I do not share the view that section 17 contravenes Article VIII, section II, paragraph 2 of the Constitution of 1947, providing that "no money shall be drawn from the State Treasury but for appropriations made by law."

This section is concerned only with the "preliminary expenses" attending the inauguration of the turnpike projects found needed in the common interest. The act contains a legislative finding that "modern express highways embodying every known safety device," enumerated in part, are essential "to remove the present handicaps and hazards on the congested highways in the State." The cited section merely provides for the discretionary use of moneys already appropriated to the State Highway Department for highway purposes and the Department's engineering and traffic skills "for the study" of turnpike projects, and the reimbursement of "the funds so expended" from the proceeds of the sale of revenue bonds to finance the particular turnpike project. Such expenditures may be made, in the Department's discretion, only out of funds "available for the purpose;" and "obligations" and "expenses" incurred by the Department with the Authority's approval "for traffic surveys, borings, preparation of plans and specifications, and other engineering services in connection with the construction of a project" are deemed a part of the cost of the project for which reimbursement shall be made "out of the proceeds of bonds" therein authorized.

Such disbursements would not constitute an interdepartmental use of appropriated funds without legislative authority, but rather the use of the moneys by specific legislative direction in the performance of the Department's normal function of making such preparatory study of highway proj-

ects to meet a public need. It cannot matter that in the particular instance the project may eventually be undertaken and consummated by the Authority. The Legislature is invested with authority to appropriate moneys for a public purpose; and the use of the Highway Department's technical and other facilities to make this preliminary contribution to projects committed to the Authority does not serve to render the State liable for the Authority's bonded or other indebtedness within the intendment of Article VIII, section II, paragraph 3 of the Constitution, or to alter its essential character. The statute does not empower the Highway Commissioner, "year by year," to "turn over all of his funds" to the Authority; as we have seen, the "study" of the turnpike projects is to be made by the Highway Department and its engineering staff; and the cost is to be defrayed, pending reimbursement, "out of any funds available for the purpose." This is a definite and precise limitation of such expenditures to the Department's fund available for surveys of that character. Such authority resides in the Commissioner with respect to highway construction within his province.

Provision for the study of turnpike projects out of "available" departmental funds is not within the interdiction of Article VIII, section II, paragraph 3 of the Constitution. In this, there is not a diversion of the moneys to private or other purposes beyond the province of the Legislature. A different principle is not applicable merely because the preliminary study involves a project entrusted to the Authority. It is nevertheless a public purpose clearly within the competency of the Highway Department's engineering staff. And it is equally evident that there is in these circumstances no "loan" of the State's credit within the purview of Article VIII, section II, paragraph 1 of the Constitution. Constitutional limitations must be expressed in certain and definite terms.

The Turnpike Authority is not thereby brought within the principle of *Wilson v. State Water Supply Commission,* 84 *N. J. Eq.* 150 (*E. & A.* 1915). As respects Article VIII, section II, paragraph 3 of the Constitution, the distinguishing

characteristics are fundamental. The essential differences in this behalf are well stated by the Chief Justice; the provision under consideration has no bearing upon that question.

And section 27:23-5(j) of the cited statute contains what I conceive to be a clear and unambiguous grant to the Authority of the right to take state property by condemnation. The Authority is empowered, in absolute and unqualified terms, to acquire "public lands" by the exercise of the power of eminent domain. Section 27:23-14 authorizes the several public departments, agencies and commissions of the State to lease, lend, grant or convey to the Authority "any real property which may be necessary or convenient to the effectuation of the authorized purposes of the Authority, including public roads and other real property already devoted to public use." The right of condemnation complements the power to acquire such property by agreement, and is indispensable to the exercise of the functions assigned to the Authority. The statute was designed to be self contained. The question in the final analysis is one of intention; and the power may arise by clear implication from the nature of the work and the impracticability of its construction without encroaching on land already in public use. This proposition has general acceptance, as is shown by the text writer cited in the majority opinion. The right of eminent domain is to be reasonably exercised to serve the statutory policy.

I concur in the reasoning and result.of the opinion of the Chief Justice in all other particulars.

I would affirm the judgment.

Mr. Justice Burling joins in this dissent.

*For modification*—Chief Justice VANDERBILT, and Justices CASE, OLIPHANT, WACHENFELD and ACKERSON—5.

*For affirmance*—Justices HEHER and BURLING—2.