29 N.J. Super. 154 (1953)
102 A.2d 84
THE BOROUGH OF ROCKLEIGH, IN THE COUNTY OF BERGEN, A MUNICIPAL CORPORATION OF THE STATE OF NEW JERSEY, AND PFEIL REALTY CO., A CORPORATION OF NEW JERSEY, PLAINTIFFS-APPELLANTS,
v.
ASTRAL INDUSTRIES, INC., A CORPORATION OF NEW JERSEY, DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued December 7, 1953.
Decided December 24, 1953.
*157 Before Judges JAYNE, FRANCIS and STANTON.
Mr. Richard G. Kroner argued the cause for the appellant Borough of Rockleigh (Messrs. Freeman & Kroner, attorneys).
Mr. Ralph W. Chandless argued the cause for the appellant Pfeil Realty Co. (Messrs. Chandless, Weller & Kramer, attorneys).
Mr. Walter H. Jones argued the cause for the respondent.
The opinion of the court was delivered by FRANCIS, J.A.D.
This is a zoning case instituted in the Chancery Division of this court in which the interested municipality and a proximate property owner sought an injunction against alleged violation of the zoning ordinance and a declaratory judgment as to the permissible scope of the alleged violator's manufacturing operations. The trial court denied the relief sought and a review of the denial is now sought. 23 N.J. Super. 255 (Ch. 1952).
The Borough of Rockleigh is a small community of 25 homes and 105 inhabitants in northern Bergen County. It is one mile square in area. The business activities are all located in one part of the borough and consist of a riding stable, a combination garage and welding shop, and the manufacturing plant of the respondent corporation, Astral Industries, Inc.
Appellant Pfeil Realty Co., consisting of Ward Greene, his wife Edith Greene, and one other person, is the owner of a 7 1/2-acre parcel of land on the northeast corner of County Road and Willow Avenue in the borough. The Greenes reside in a substantial home thereon.
The plant of Astral Industries, Inc. is located on the southeast corner of the same intersection across the street from the Greene premises. The building stands on a plot 554 x 314 x 622 x 308 feet. Originally it was built for and used as an indoor polo field.
*158 During World War II the building was purchased by the Aero Metalcraft Corporation and used for the manufacture of mufflers for planes, chairs, cabinets and parts for military tanks.
At this time the borough had a zoning ordinance, adopted in 1924, under which the premises were located in a residential zone. However, in 1944 the ordinance was amended to legalize the business activity of Aero Metalcraft by changing the zone and designating it as zone "D," light industrial.
In 1948 Aero Metalcraft became bankrupt and thereafter, in latter March or early April 1949, under an agreement with the trustee in bankruptcy, respondent Astral Industries, Inc. took possession and began manufacturing small refrigerators. On April 8, 1949 a contract of purchase was made with the trustee but it was not consummated until July 26, 1950, when the deed was delivered.
On April 5, 1949, while the manufacturing was still in progress, the zoning ordinance was again amended and the premises placed back in the residential zone. However, in this proceeding the municipality recognizes that Astral's pre-existing nonconforming use is not affected thereby so long as its operations are within those permitted in the light industrial zone.
This zone is described as follows:
"Section 4, District D Zone. (A) 2. Light manufacturing which is herein defined as the converting of raw, finished or unfinished material into an article or articles of a similar or different character, purpose or use, printing, publishing, engraving, woodworking, carpentering, cabinet making, of any nature which does not require power of any kind more than the equivalent of five (5) H.P. of electrical energy per machine and which does not involve or require hammering or striking together or beating of metal or hard substance."
When Astral assumed possession of the premises it recognized that the municipal fire-fighting facilities were extremely limited. Wells were and are the sole source of water. No water mains have ever been laid in the borough as the governing body was opposed to them. The reason assigned was that such mains probably would attract substantial *159 numbers of home builders to the community, which in turn would require the establishment of schools, public buildings, a police department and other services normally supplied by government. The desire was to keep the community small and residential and to keep the tax burden down.
A study of the fire-fighting problem was made by respondent as a result of which a plan was proposed whereby the Hackensack Water Company would extend its mains into the borough and thus provide water for a tank of undisclosed size to be built on respondent's premises. Around August 1950 the plan was discussed with the mayor and then with the council, and the borough's opposition to extension of the mains along the public streets from Northvale, an adjoining municipality, to the plant was announced to respondent and a representative of the water company.
However, Astral proceeded with arrangements to accomplish its objective and assumed financial obligations to a total of $85,318.58 therefor. The total was made up of these items:

 Water tank ............................... $11,370.00
 Tank foundation .......................... 2,000.00
 Sprinkler pipe installation in factory ... 30,469.58
 Excavation ............................... 800.00
 Pump ..................................... 3,779.00
 Water mains .............................. 30,000.00
 Boiler house operations .................. 1,000.00
 Oil tank for boiler ...................... 1,000.00
 Boilers .................................. 4,500.00
 Miscellaneous and labor .................. 400.00

Substantial progress toward completion of the project was made by April 1951. The sprinkler system, for which the contract had been made in December 1950, was fully installed and some noticeable outside work had been completed, including a water hydrant near the public street.
On April 5, 1951 Astral applied for and was granted by the building inspector a permit for the construction on its property of a 250,000-gallon water tank. About the last week in March the mayor had heard talk about the tank and *160 the matter was the subject of some discussion at the council meeting of April 3. However, no official action was taken at that time. Around April 7 or 8 the mayor saw visible signs of its construction and he said that it was fully erected, so far as outward appearance went, in a little over a week.
The tank is a mammoth structure; it is separated from the plant itself by 65 feet. The dimensions do not appear, but a sizeable picture thereof is included in appellant's appendix. In this picture, and making allowance for perspective, the tank seems to dwarf everything in sight, including trees, an electric light pole and the home of the Greenes, which can be seen to the right of and diagonally across the street, and it towers above the roof of the plant. The uncontradicted evidence is to the effect that its use will be limited to fire protection and particularly to feed the sprinkler system.
One month after the issuance of the building permit, appellants brought this action for injunction and declaratory judgment.
It is urged now, as it was in the trial court, that the tank constitutes an unlawful extension of a nonconforming use.
A prime purpose of a zoning ordinance is to provide for the orderly physical development of the community by confining particular uses of property to specified locations. Nonconforming uses, which must be recognized because they preceded the ordinance, are inconsistent with that spirit and purpose and they represent conditions which should be reduced to conformity as speedily as is compatible with justice. Gunther v. Board of Zoning Appeals, 136 Conn. 303, 71 A.2d 91 (Sup. Ct. Err. 1949).
It is the policy of the law to restrict closely uses which do not accord with the zoning ordinance; although they may be continued, they may not be enlarged or extended. Adler v. Department of Parks, Irvington, 20 N.J. Super. 240 (App. Div. 1952); Home Fuel Oil Co. v. Board of Adjustment of Glen Rock, 5 N.J. Super. 63 (App. Div. 1949); Home Fuel Oil Co. v. Glen Rock, 118 N.J.L. 340 *161 (Sup. Ct. 1937); DeVito v. Pearsall, 115 N.J.L. 323 (Sup. Ct. 1935).
The term "nonconforming use" comprehends both the physical structure on the land in question and the functional use of the land or structure. And the restriction of extension or enlargement referred to in the cases relates to structure as well as use thereof. In fact, the Legislature, in sanctioning repair or restoration in the event of partial destruction of a non-conforming building, seems plainly to have had the original structure in mind. In N.J.S.A. 40:55-48, it said:
"Any nonconforming use or structure existing at the time of the passage of an ordinance may be continued upon the lot or in the building so occupied and any such structure may be restored or repaired in the event of partial destruction thereof." (Italics ours)
Respondent places great reliance upon the fact that the tank does not represent any departure whatever from the present nature and extent of its manufacturing operations or from the size or use of the existing physical plant. The assertion is that the tank as a separate structure is simply and wholly to protect the plant in the event of fire, by providing the necessary water for the new sprinkler system.
Such argument is not tenable as a justification for the construction of the gargantuan tank as a new structure separated by 65 feet from the main building. In our judgment this addition to the plant facilities is an unlawful enlargement of the antecedent nonconforming use.
Additions to or enlargements of nonconforming structures have been condemned. For example, the construction of a fuel oil tank to hold 360,000 gallons of fuel oil, in addition to the existing six smaller tanks with a total gallonage of 100,000 gallons (Home Fuel Oil Co. v. Glen Rock, 118 N.J.L. 340 (Sup. Ct. 1937)); a similar situation with the same company 12 years later (5 N.J. Super. 63 (App. Div. 1949)); a proposed cinder block addition of sizeable proportions designed to enclose the rear portion of a soda bottling plant (Pieretti v. Johnson, 132 N.J.L. 576 (Sup. *162 Ct. 1945)); the addition of a single-story frame structure, 16 by 24 feet, to a boardwalk shop in order to increase the storage space and to provide a bedroom (Burmore v. Smith, 124 N.J.L. 541 (E. & A. 1940)); the addition of three 10,000-gallon tanks for fuel oil, located above ground, to augment a coal business being conducted on the premises (Brandt v. Zoning Board of Adjustment, 16 N.J. Super. 113 (App. Div. 1951)); the tearing down of a greenhouse and the erection of another much larger one (DeVito v. Pearsall, 115 N.J.L. 323 (Sup. Ct. 1935)).
In the last-mentioned case, the landowner argued that the entire lot had been used for business and so he should be protected in that use. But Justice Case, for the Supreme Court, said:
"Carried to its logical result, the argument made for the prosecutor is that if a nonconforming use is once established on a property, that use may be extended and enlarged to the length and breadth of the entire plot without restraint as to height and depth. We do not understand that to be the law." (p. 325)
Respondent criticizes the borough council for its willful refusal to allow the water mains to be extended into the borough for the protection of its property in the event of fire. The record discloses that the public fire-fighting facilities consist of a volunteer fire department which operates a gasoline-driven portable fire pump with a capacity of 500 gallons of water a minute. The sprinkler system installed consists of 400 heads and if the entire plant were involved in a fire at one time, "possibly" 4,000 gallons a minute would be needed.
In this connection, it cannot go unnoticed that respondent was aware of the limited fire-fighting equipment of the municipality when it went into occupancy of the premises. This fact detracts substantially from the force of any claim of right to enlarge or add to the nonconforming structure.
Stress is laid upon the circumstance that a permit was issued by the building inspector to build the tank, and that *163 it and the entire system is substantially complete with the attendant large expense. Therefore, it is suggested, an estoppel exists against the municipality, which bars any injunctive remedy. However, such an argument loses sight of the company's deliberate action in the face of known opposition by the borough to the extension of the water mains. It overlooks also that the permit was unlawful because the building inspector had no authority to sanction the enlargement of a nonconforming use. Consequently no right can derive from the permit and under the circumstances presented no estoppel can arise from it. Adler v. Department of Parks, Irvington, supra, p. 243.
Appellant claims, also, that the business operations themselves have been extended beyond the nonconforming use which was authorized for the light industrial zone.
As already set forth, the ordinance permits such manufacturing as does not require power more than the equivalent of five horsepower of electrical energy per machine. The evidence discloses that when borough officials visited the plant shortly before the trial, they found 25-horsepower motors attached to three air compressors. The compressors were not in operation and respondent insists that there is no proof that the compressors either require or use more than five horsepower.
We find no evidence that each compressor requires a 25-horsepower motor for purposes of operation. There is no proof, for example, that once such a motor is put in operation, its full horsepower is used, although the compressor may need only five horsepower. And judicial notice cannot be taken of any such fact. Cf. National Lumber Products Co. v. Ponzio, 133 N.J.L. 95 (Sup. Ct. 1945).
The trial court agreed with respondent that an enlargement of a nonconforming use had not been shown and that in any event the circumstances established an estoppel against the borough. For the reasons already stated, we have concluded that both of these determinations were erroneous.
Respondent protests that the borough failed to prove that the zoning ordinance and the amendments thereto *164 were adopted legally. In accordance with N.J.S. 2A:82-14, N.J.S.A., and R.R. 4:45-1, a copy of the ordinance certified by the clerk was received in evidence. Cf. Ackerman v. Nutley, 70 N.J.L. 438, 441 (Sup. Ct. 1904). The duty of establishing the invalidity of the presumptively valid ordinance then rested with respondent. The trial court was satisfied after a consideration of the evidence that the burden had not been met and we see no reason to disturb his finding.
One further problem remains. Appellant insists that it is entitled to a declaratory judgment "delineating the extent of operation which would be permitted on the part of Astral Industries in the future * * *." The Declaratory Judgments Act (R.S. 2:26-66, et seq.) does not justify any such excursion into the future. New Jersey Turnpike Authority v. Parsons, 3 N.J. 235 (1949).
Under all the circumstances, the judgment is reversed and the matter remanded for the issuance of a mandatory injunction directing dismantling of the water tank.