COUNTY OF CAMDEN, A MUNICIPAL CORPORATION, AND THE BOARD OF EDUCATION OF THE VOCATIONAL SCHOOL IN THE COUNTY OF CAMDEN, A BODY CORPORATE, PLAINTIFFS-APPELLANTS, v. THE PENNSAUKEN SEWERAGE AUTHORITY, DEFENDANT-RESPONDENT.

Argued April 26, 1954—Decided May 24, 1954.

458

*Mr. Edward T. Curry* argued the cause for appellants (*Mr. Vincent L. Gallaher,* of counsel with the appellant County of Camden, on the brief).

*Mr. Arthur W. Lewis* argued the cause for respondent (*Messrs. Lewis and Hutchinson,* attorneys).

The opinion of the court was delivered by

HEHER, J.    The questions here are: (a) whether the defendant authority's mode of exercise of the statutory power to levy charges for sewerage service accords with the grant, and if so (b) whether the action so taken constitutes a denial of the equal protection of the laws secured by the Fourteenth Amendment to the Federal Constitution.

These inquiries were resolved in favor of the authority by the Law Division and the Appellate Division of the Superior Court.    28 *N. J. Super.* 586 (*App. Div.* 1953).    The constitutional question sustains plaintiffs' appeal as of right. 1947 *Constitution, Article* VI, *Section* V, *paragraph* 1(*a*).

The authority is a "public body politic and corporate" created by an ordinance adopted August 28, 1950 by the governing body of the Township of Pennsauken according to *L.* 1946, *c.* 138, *N. J. S.* 40:14A–1 *et seq.,* empowering, *section* 2, "counties, or municipalities either separately or in combination with other municipalities, by means and through the agency of a sewerage authority, to acquire, construct, maintain, operate or improve works" for the "collection, treatment, purification or disposal of sewage or other wastes," and, "if necessary, works for the impounding, transportation and release of water for the replenishment in periods of drought or at other necessary times of all or a part of waters in or bordering the State diverted into a sewer, sewage treatment or sewage disposal system operated by the sewerage authority," and, *section* 8(*a*), "to charge and collect rents, rates, fees or other charges (in this act sometimes referred to as 'service charges') for direct or indirect connection with, or the use or services of, the sewerage system."    The authority, *N. J. S.* 40:14A–4(*a*), shall be identified with its creator by the use

in its name of "all or any significant part of the name" of the municipality.

The plaintiff County of Camden, in its governmental capacity, maintains and operates at 2276–43rd Street in the Township of Pennsauken, a local unit of government within the county, an institution known as the Camden County Children's Shelter and School; and the co-plaintiff Board of Education of the Vocational School in the County of Camden, a public body corporate, manages a county vocational school on Browning Road, within the township.

Both "plaintiff institutions," it is stipulated, "are attended by, and occupied by, students and children from various municipalities in the County of Camden, as well as some municipalities from outside of the County of Camden; some of the parents of such children are taxpayers of the County of Camden and a few are not; some of such parents are taxpayers outside of the County of Camden; some of such students and children live in and come from homes in many municipalities in Camden County in addition to the Township of Pennsauken"; both "institutions are supported, operated and maintained by County funds, derived from taxation of all municipalities in" the County of Camden; "in addition the Vocational School receives funds from the State and Federal Government." The stipulation terms all three bodies "municipal corporations," these two and the defendant sewerage authority.

Prior to the organization of the authority, the local sewerage plant was maintained and operated directly by the township itself. A charge for sewer service was first made in 1927, at the "annual unit rate of $2.08"; this levy remained in effect until 1935, when the annual unit rate was increased to $3, and such was the rate until April 5, 1951, when the defendant authority, by resolution, adopted a schedule of sewerage charges which fixed a minimum annual charge of $10 for a prescribed "standard living unit," and a like minimum annual charge "for all commercial and industrial businesses and establishments," "for each water closet or its equivalent." On February 19, 1952 the authority amended

the resolution to provide for a "sewer service charge or sewer rental charge for all buildings, dwellings, construction and property of whatsoever kind and type, except the Pennsauken Township public schools, the fire houses and buildings used and occupied by the fire companies in" the Township, "and any and all buildings, construction and property owned and/or operated" by the Township, "which are now directly or indirectly connected with or which may in the future be connected with said comprehensive sewerage system." And on March 17, 1953, after the commencement of this action, there was a further amendment of the regulation prescribing a charge of $10 for a sewer-connection permit, but making no change in the provisions apposite here.

Apart from the question of the scope of the statutory grant, this exemption of the enumerated township facilities from the incidence of the sewer-service charge is assailed as "unjustly discriminatory against plaintiffs"; and judgment is sought voiding the concession thus accorded the township facilities as "illegal and void," or, in the alternative, that a like exemption "be granted to all public buildings" in the township, including those of plaintiffs.

Before the authority came into being, there were no sewer-service charges "levied against or collected" from any of the Pennsauken Township public schools, nor from any of the township "owned and/or operated property," nor from any of the township "Fire Companies," except the "North Merchantville Fire Company," which for a few years prior to the creation of the defendant had been charged $3 per unit per year for use of sewerage facilities."

Previous to April 5, 1951 the County of Camden "had paid sewer service charges" for the use of the township's sewerage facilities; "since 1925, and for several years prior to" that day, the county "had been paying $30 per year" for the service, "at the rate of $3 per unit, based on ten units"; and for approximately 20 years before, the vocational school board had paid for the use of the facilities, "for several years"

$150 per annum, "at the rate of $3 per unit, based on fifty units."

Thus, under the resolution of April 5, 1951 the annual sewer charge levied against the county for the shelter and school was increased to $100, and against the vocational school board, to $500. The county has not paid the sewer charges laid against it for 1951 and 1952; the school board paid but one-half of the charge for 1951, and there was no payment on the charge for 1952.

The ordinance creating the defendant authority declares it to be "an agency and instrumentality" of the township "for the purposes of the relief of the waters in and bordering the State from pollution arising from causes within" the township, "and the consequent improvement of conditions affecting the public health." To effectuate the purpose, the township forthwith granted and conveyed to the authority its right, title and interest in the "sewer lines and the sewer pumping station" in the township, and "its one-half interest in the sewage treatment plant" therein, situate on Browning Road, and also conveyed to the authority vacant land in excess of 14 acres for use in the construction of a new sewage treatment plant, all of the value of $2,500,000; and the authority was enjoined to "finance its share of the cost of operating and maintaining said sewage treatment plant and pumping stations, together with the maintenance of all sewer lines" in the township, and "to levy and collect sewer service charges from the users" of the facilities.

The specific contention is that the exemption of the township's schools and other public buildings and facilities from the charge for sewer service as laid against the county and the vocational school board for public buildings and facilities of the same class runs counter to *section* 8 (*a*) of the creative act, *N. J. S.* 40 :14A–8, empowering the authority, as just said, to charge "for direct or indirect connection with, or the use or services of, the sewerage system," and providing for the collection of such service charges "from any person contracting for such connection or use or services or from the owner or occupant, or both of them, of any real property

which directly or indirectly is or has been connected with the system or from or on which originates or has originated sewage or other wastes which directly or indirectly have entered or may enter the sewerage system," but directing that "Such rents, rates, fees and charges, being in the nature of use or service charges, shall as nearly as the sewerage authority shall deem practicable and equitable be uniform throughout the district for the same type, class and amount of use or service of the sewerage system * * *." The service charges shall, *section* 8(*c*), "in any event" be such that "the revenues" of the authority "will at all times be adequate to pay all expenses of operation and maintenance of the sewerage system, including reserves, insurance, extensions, and replacements, and to pay punctually the principal of and interest on any bonds and to maintain such reserves or sinking funds therefor as may be required by the terms of any contract of the sewerage authority or as may be deemed necessary or desirable by the sewerage authority."

The essence of the argument is that the defendant authority is an "independent, autonomous public corporation separate and apart" from the township, "and not a part of nor an agent" of that local unit, and the exoneration of the township from the sewer-service charges and the laying of the burden upon the plaintiff bodies corporate constitutes a subversion of the statutory design and a denial of the equal protection of the laws guaranteed by the Fourteenth Amendment. We find it to be untenable.

While the avowed legislative purpose, *N. J. S.* 40:14*A*–2, is "to foster and promote by all reasonable means the relief of waters in or bordering the State from pollution and thus to reduce and ultimately abate the menace to the public health resulting from such pollution," and the authority organized to implement the policy is deemed, *N. J. S.* 40:14*A*–7, "a public body politic and corporate constituting a political subdivision of the State established as an instrumentality exercising public and essential governmental functions to provide for the public health and welfare," the defendant authority, like the municipality which gave it being,

is yet an agency or instrumentality for local administration in the vital field of sanitation and health, an area of government that is a primary responsibility of the municipality itself. Indeed, as we have seen, *N. J. S.* 40:14A–4, continuing agency is a basic attribute of the local legislative creation. Though given a measure of autonomy, it is nevertheless the *alter ego* of the municipality in the service of this essential public need. While a separate and distinct economic and governmental unit, it is but the means of discharging the local governmental responsibility for the public health, comfort, convenience and welfare in relation to the disposal of sewage, and the conservation and protection of its water resources against pollution and waste, for the benefit of all the State's inhabitants, involving a *quasi*-legislative function.

The municipality is authorized, separately or in combination, *N. J. S.* 40:14A–2, "by means and through the agency" of the authority, to "acquire, construct, maintain, operate or improve works" for the sanitary disposal of sewage in the fulfillment of this governmental function, "at the expense of the users of such services"; and counties, municipalities, and the instrumentalities thus created are given "discretionary powers to provide for sewerage services" to this end. An authority organized by a single municipality, *N. J. S.* 40:14A–4(*b*), shall consist of five members appointed by the governing body. It is authorized and directed, *N. J. S.* 40:14A–6; 40:14A–7; 40:14A–20, to acquire "in its own name but for the local unit"—*i. e.*, the municipality, and to construct, maintain, operate and use such sewers, conduits, pipelines, pumping and ventilating stations, treatment plants and works at such places within or without the district, and such compensating reservoirs within the county in which the district lies, and such other plants, structures, boats and conveyances as may be deemed necessary for its purposes, and to acquire real and personal property to that end. But neither the local unit nor the authority may, *N. J. S.* 40:14A–27, "mortgage, pledge, encumber or otherwise dispose of any part of the sewerage system," save that the authority "may

dispose of such part or parts thereof as may be no longer necessary for the purposes" of the authority.

The municipality is given discretionary power, *N. J. S.* 40:14A–9, to "appropriate moneys for the purposes" of the authority, and to "loan or donate such moneys * * * in such installments and upon such terms as may be agreed upon" between it and the authority. There is provision, *N. J. S.* 40:14A–10, 40:14A–11, 40:14A–12, for the issuance of bonds by the "local unit or units," as well as by the authority itself, to raise funds to defray "the cost of any part" of the authority's sewerage system, pursuant to a resolution adopted by the authority. The "system revenues" and other moneys of the authority, *N. J. S.* 40:14A–16, may be pledged or trusteed to secure the payment of the principal and interest accruing "on the bonds or any other obligations, or the payment of expenses of operation or maintenance of the sewerage system," and may be used for the creation of "reserves and sinking funds." And in the event of default in payment, if the bonds so provide, *N. J. S.* 40:14A–17, the trustees may and, when requested by the holders of 25% in aggregate principal of the bonds of such series then outstanding, shall take legal proceedings to enforce the defaulted bonds, "including the right to require" the authority "to charge and collect service charges adequate to carry out any contract as to, or pledge of, system revenues," and to compel performance by the authority of the "terms of any contract with the holders of such bonds or its duties under this act." "Any county," by resolution, or "any municipality," by ordinance, *N. J. S.* 40:14A–22, may "without any referendum" and "without the consent of any board, officer or other agency of the State, * * * sell, lease, lend, grant or convey to any sewerage authority, or * * * permit any sewerage authority to use, maintain or operate as part of the sewerage system, any real or personal property owned by it, including all or any part of any system of main, lateral or other sewers or other sewerage facilities, which may be necessary or useful and convenient for the purposes of the sewerage authority and which may be accepted by the sewerage authority"; such

"sale, lease, loan, grant, conveyance or permit may be made with or without consideration and for a specified or an unlimited period of time and under any agreement and on any terms and conditions which may be approved by such county, municipality or other person and which may be agreed to by the sewerage authority in conformity with its contracts with the holders of any bonds"; and subject "to any such contracts with holders of bonds, the sewerage authority may enter into and perform any and all agreements with respect to property so accepted by it, including agreements for the assumption of principal or interest or both of indebtedness of such county, municipality or other person or of any mortgage or lien existing with respect to such property or for the operation and maintenance of such property as part of the sewerage system."

And, generally, the relations between the municipality and the authority, *N. J. S.* 40:14A–23, are subject only to the restraints inherent in the statutory scheme and in the contracts with the holders of outstanding bonds. Save as in this wise restricted, the authority is free reasonably to fix the terms and conditions of service. It is provided that it, *N. J. S.* 40:14A–35, "shall not be subject to regulation as to its service charges or as to any other matter whatsoever by any officer, board, agency, commission or other office of the State."

Thus it is that the agreed immunity of the township from a charge for sewer service extended to its public buildings and facilities does not constitute a disservice to the principle and policy of the statute. The sewerage plant and appendages and the land for the enlargement and modernization of the means of sewage disposal were transferred and conveyed to the authority as an instrumentality of the township in the performance of an essential governmental function indispensable to the health, comfort and convenience of its own inhabitants and, by the same token, the safety and welfare of the people of the State at large and as well our neighbors whose security would be menaced by the pollution of the State's waters and streams; and to charge the munici-

pality itself for this service in the management of its public facilities would be to levy an assessment for the use of its own property in the vicarious fulfillment of a governmental responsibility that had theretofore been done directly in the selfsame manner, under the same terms and conditions, without complaint of inequality from the plaintiff governmental units.

The use of the authority for the rendition of the service does not alter the principle. The township remains the beneficial owner of the property devoted to the service. The authority is a politico-economic unit, largely self-contained and self-sufficient, for greater economic and administrative efficiency in a sensitive and critical area rendered more complex by industrial expansion and rapid population growth, autonomous for *quasi*-legislative and administrative purposes, but an agency of the municipality nevertheless for a governmental service that under the legislative scheme is one of the local government's primary concerns. The incidence of an assessment for sewer service to the municipality's public buildings and facilities, falling as it would upon the local taxpayers, would give rise to an economic imbalance unduly favorable to the plaintiff public bodies who serve outside interests under no tax duty to the particular municipality. The "equality" suggested by plaintiffs would exclude compensation for the large capital investment represented by the municipality's sewer plant, facilities and land devoted to the service thus provided by the authority as its *alter ego*.

An objective analysis of the relation between these several governmental units and the nature of the service in the context of the statutory policy reveals the fallacy of plaintiffs' reasoning. We need not speculate on the application of the statute in other circumstances, *e. g.*, where the authority is a wholly self-sustained economic unit serving several local governmental units on equal terms. We do not have that case here, and we venture no opinion on substantially different hypotheses. And we are not concerned with the rights of bondholders under their several contracts.

There is in the course taken here no departure from the essence of the legislative purpose, and no inequality of treatment within the concept of the equal protection clause of the Fourteenth Amendment.

The equal protection clause is closely of kin to the due process provision of the Fourteenth Amendment, and, while the violation of one may also involve the breach of the other, these spheres of protection are not conterminous. The principle of due process is found in Magna Charta and the early state constitutions and was later given expression in the Fifth Amendment to the Federal Constitution as a limitation upon the executive, legislative and judicial powers of the Federal Government, while the equality clause is not embodied in the Fifth Amendment and is not applicable to the federal legislative authority. It bears exclusively on state action; it operates only on state governments and the instrumentalities of state action. *Truax v. Corrigan*, 257 *U. S.* 312, 42 *S. Ct.* 124, 66 *L. Ed.* 254 (1921). The equal protection clause inhibits only such action as may fairly be said to be that of the states. The amendment does not serve to bar merely private conduct, however discriminatory or wrongful. *Shelley v. Kraemer*, 334 *U. S.* 1, 68 *S. Ct.* 836, 92 *L. Ed.* 1161, 3 *A. L. R.* 2d 441 (1948). But not every denial of a right conferred by state law involves a denial of the equal protection of the laws, "even though the denial of the right to one person may operate to confer it on another. * * * The unlawful administration by state officers of a state statute fair on its face, resulting in its unequal application to those who are entitled to be treated alike, is not a denial of equal protection unless there is shown to be present in it an element of intentional or purposeful discrimination." *Snowden v. Hughes*, 321 *U. S.* 1, 64 *S. Ct.* 397, 88 *L. Ed.* 497 (1944).

The prohibitions and guaranties of the Fourteenth Amendment are addressed to and control, not only the states, but also "every person, whether natural or juridical, who is the repository of state power," and so acts done under the authority of a municipal ordinance enacted in virtue of power

conferred by a state are embraced by the Amendment. *Home Telephone & Telegraph Co. v. Los Angeles*, 227 *U. S.* 278, 33 *S. Ct.* 312, 57 *L. Ed.* 510 (1913). But a municipal corporation, being a creature of the state, cannot invoke the equal protection principle secured by the Fourteenth Amendment against an act of the state legislative authority. The local unit of government has no privileges or immunities under the Federal Constitution which it may exert "in opposition to the will of its creator." *Williams v. Baltimore*, 289 *U. S.* 36, 53 *S. Ct.* 431, 77 *L. Ed.* 1015 (1933).

A county or municipality is a political subdivision of the state, created as a convenient agency for the exercise of such of the governmental powers of the state as may be entrusted to it by the legislative authority; and in the very nature of the relation the restraints of the Fourteenth Amendment have no application. *City of Trenton v. New Jersey*, 262 *U. S.* 182, 43 *S. Ct.* 534, 67 *L. Ed.* 937 (1923). The Legislature is not precluded by these constitutional guaranties "from putting a burden upon one municipality because it may result in an incidental benefit to another." *Joslin Mfg. Co. v. Providence*, 262 *U. S.* 668, 43 *S. Ct.* 684, 67 *L. Ed.* 1167 (1923). And it is the "individual * * * who is entitled to the equal protection of the laws,—not merely a group of individuals, or a body of persons according to their numbers." *Mitchell v. United States*, 313 *U. S.* 80, 61 *S. Ct.* 873, 85 *L. Ed.* 1201 (1941).

The challenged action is not *ultra vires*, but rather a *bona fide* exercise of the delegated power for the common good and welfare; and, even though the equal protection clause be deemed applicable between these local subdivisions of government, the plaintiffs have no ground for asserting inequality of treatment within that constitutional policy. It was a reasonable exercise of discretion under the statute. It is not a case of arbitrary selection or classification. There is a rational basis for the distinction related to the policy of the statute. Compare *Ring v. Mayor and Council of Borough of North Arlington*, 136 *N. J. L.* 494 (*Sup. Ct.* 1948), affirmed 1 *N. J.* 24 (1948); *Washington National*

*Insurance Co. v. Board of Review,* 1 *N. J.* 545 (1948); *State v. Garford Trucking, Inc.,* 4 *N. J.* 346 (1950); *Citizens to Protect Public Funds v. Board of Education of Parsippany-Troy Hills,* 13 *N. J.* 172 (1953). Equality in the constitutional sense does not mean mathematical exactitude. And disapproval of the wisdom or fairness of the act is not alone a ground for judicial interference, if it is not beyond the sphere of the constituted authority. In the latest pronouncement on the subject by the Federal Supreme Court, Mr. Justice Jackson said:

"Equal protection does not require identity of treatment. It only requires that classification rest on real and not feigned differences, that the distinction have some relevance to the purpose for which the classification is made, and that the different treatments be not so disparate, relative to the difference in classification, as to be wholly arbitrary." *Walters v. St. Louis,* 347 *U. S.* 231, 74 *S. Ct.* 505, 98 *L. Ed.* (1953).

Affirmed.

BURLING, J. (dissenting). The defendant in this case is a public body having corporate form and attributes. It was created by the Township of Pennsauken under the "Sewerage Authorities Law," *L.* 1946, *c.* 138, *sec.* 1 *et seq., N. J. S. A.* 40 :14*A*–1 *et seq.* The defendant was created to perform a public duty, namely to provide for sewerage service, and this duty expressly entailed the performance of services to be paid for by the user in the form of a service charge. Examples of comparable statutory provisions to those contained in the Sewerage Authorities Law are the Incinerator Authorities Law, *L.* 1948, *c.* 348, *sec.* 1 *et seq., N. J. S. A.* 40 :66*A*–1 *et seq.,* the Parking Authority Law, *L.* 1948, *c.* 198, *sec.* 1 *et seq., N. J. S. A.* 40 :11*A*–1 *et seq.,* and the New Jersey Turnpike Authority Act of 1948, *L.* 1948, *c.* 454, as amended and supplemented by *L.* 1949, *cc.* 40, 41, *L.* 1950, *c.* 1, *L.* 1951, *cc.* 264, 286, and *L.* 1952, *c.* 35, *N. J. S. A.* 27 :23–1 *et seq.* Authorities created under the foregoing examples of comparable statutes have been held to be independent entities,

*Scatuorchio v. Jersey City Incinerator Authority,* 14 *N. J.* 72, 89 (1953); *De Lorenzo v. City of Hackensack,* 9 *N. J.* 379, 384–387 (1952); and *New Jersey Turnpike Authority v. Parsons,* 3 *N. J.* 235, 243–244 (1949). The defendant is designed to "sell" its services to all having need thereof, on a self-liquidating basis. In fact, upon the defendant's failure to meet its obligation on its outstanding bonded indebtedness, the plant may be acquired by a receiver and operated on behalf of the bondholders. I perceive no substantial deviation in the Sewerage Authorities Law from the controlling factors expressed in the *Scatuorchio, De Lorenzo* and *New Jersey Turnpike Authority* cases, and the statutes construed therein, *supra.* Therefore they are controlling decisions of this court and their application results in the conclusion that the defendant is an independent entity "in but not of" the parent township. *Cf. New Jersey Turnpike Authority v. Parsons, supra* (3 *N. J.,* at *p.* 244).

The principal question involved in this case is the scope of the defendant's power concerning the establishment of rates. Whether the defendant be independent under the views hereinabove expressed, or captive under the views expressed in the opinion of the majority of the court, it is nevertheless bound to act solely within the confines of the delegated legislative power. "It is axiomatic that municipal bodies in this State have no powers other than those delegated by the Legislature, and must perform their prescribed activities within the statutory ambit." *Scatuorchio v. Jersey City Incinerator Authority, supra* (14 *N. J.,* at *p.* 85); *Grogan v. De Sapio,* 11 *N. J.* 308, 314–317, 321 (1953); *Edwards v. Mayor, etc. of Borough of Moonachie,* 3 *N. J.* 17, 21–22 (1949).

Under the express terms of the statute I am constrained to determine that the exemptions accorded the Township of Pennsauken and other public or *quasi*-public bodies by the defendant are *ultra vires* and should be vacated. The power to make the discriminatory rates is not only absent from the statute but is expressly barred thereby. *L.* 1948, *c.* 138, *sec.* 26, *par.* (*b*), *N. J. S. A.* 40:14A–26(*b*) provides:

"(b) Each county, municipality and other public body shall promptly pay to any sewerage authority all service charges which the sewerage authority may charge to it, as owner or occupant of any real property, in accordance with section eight of this act, and shall provide for the payment thereof in the same manner as other obligations of such county, municipality or public body."

It is further expressly provided in the statute that the discretion of the authority in the establishment of rates shall be limited to certain specific formulae. *L.* 1946, *c.* 138, *sec.* 8, *par.* (*b*), *N. J. S. A.* 40:14A–8(*b*) provides:

"(b) Such rents, rates, fees and charges, being in the nature of use or service charges, shall as nearly as the sewerage authority shall deem practicable and equitable be uniform throughout the district for the same type, class and amount of use or service of the sewerage system, and may be based or computed either on the consumption of water on or in connection with the real property, making due allowance for commercial use of water, or on the number and kind of water outlets on or in connection with the real property, or on the number and kind of plumbing or sewerage fixtures or facilities on or in connection with the real property, or on the number of persons residing or working on or otherwise connected or identified with the real property, or on the capacity of the improvements on or connected with the real property, or on any other factors determining the type, class and amount of use or service of the sewerage system, or on any combination of any such factors, and may give weight to the characteristics of the sewage and other wastes and any other special matter affecting the cost of treatment and disposal thereof, including chlorine demand, biochemical oxygen demand, concentration of solids and chemical composition."

The detailed provisions of this act unambiguously require charges of the defendant authority to be related to the use. They may not be interpreted to grant the power to relieve any user from all charges.

The majority of the court have approved the principle that a municipal agency save as restricted by statute is free reasonably to fix the terms and conditions of service rendered by it. It seems to me that this conclusion is a departure from the established law of this State that municipal agencies have no inherent powers. See, for example, the *Edwards* case, *supra*. Were this not so, and the statute authorized the municipal body to fix reasonable rates without particularization, I could

in all justice find that rates determined according to the philosophy of preferment of local public facilities expressed in the majority opinion are within the limits of liberal construction as being necessary, fairly implied or incidental to the express power. *N. J. Const.* 1947, *Art.* IV, *Sec.* VII, *par.* 11; *L.* 1946, *c.* 138, *sec.* 35 (*N. J. S. A.* 40:14*A*–35). The statute in the present case is specific and detailed and delegates a limited power. We have recently held that liberal construction of statutes does not connote an extension of the boundaries delineated by the statutory phraseology. *Grogan v. De Sapio, supra* (11 *N. J.*, at *pp.* 316–317).

Since in the present matter some categories of users were relieved of any charges, the end result was rates not only *ultra vires* but also unfair to the users who are required to pay.

Upon this basis it is unnecessary to enter into a discussion of constitutional rights.

For the reasons expressed in this opinion I would reverse the judgment of the Superior Court, Appellate Division, and remand this matter to that court with directions for further remand by it to the Superior Court, Law Division, for entry of an appropriate judgment consistent with the views expressed in this dissent, resulting in rescheduling of the rates.

*For affirmance*—Chief Justice VANDERBILT, and Justices HEHER, OLIPHANT, WACHENFELD, JACOBS and BRENNAN—6.

*For reversal*—Justice BURLING—1.